Howard C. HIRSCH et al.,
Plaintiffs-Appellants,

v.

Edmond du PONT et al., Defendants,

and

Haskins & Sells and New York Stock
Exchange, Inc., Defendants-Appellees.

No. 622, Docket 76–7428.

United States Court of Appeals,
Second Circuit.

Argued March 7, 1977.

Decided April 7, 1977.

Sheldon D. Camhy, New York City (Richard L. Spinogatti and Shea, Gould, Climenko & Casey, New York City, of counsel), for plaintiffs–appellants.

David R. Hyde, New York City (James P. Tracy and Cahill, Gordon & Reindel, New York City, of counsel), for defendant-appellee Haskins & Sells.

Russell E. Brooks, New York City (Samuel H. Gillespie, III, Toni C. Lichstein and Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for defendant-appellee New York Stock Exchange, Inc.

Before KAUFMAN, Chief Judge, and SMITH and MULLIGAN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

In the late 1960's and early 1970's the collapse of the securities market threatened the very structure of the securities industry.[1] Such highly respected firms as Hayden, Stone, Goodbody & Co., and F.I. du

---

1. *See* New York Stock Exchange, Crisis in the Securities Industry, A Chronology—1967–1970.

Pont found themselves on the brink of insolvency. Some succumbed, and others saved themselves by providential mergers or emergency transfusions of capital.[2] The delicate financial maneuverings of this crisis period have spawned much litigation, including the case before us.

The appellants, Howard Hirsch, Paul Kohns, and Marshall Mundheim, former partners in Hirsch & Co., claim in this action that the New York Stock Exchange and Haskins & Sells, in order to facilitate the merger of Hirsch and F.I. du Pont, concealed the convoluted means by which F.I. du Pont was maintaining compliance with the Exchange's net capital rule and thereby violated the Securities and Exchange Commission's rule 10b–5. 17 C.F.R. § 240.10b–5. We agree with the district court that neither the Exchange nor Haskins & Sells owed a duty of disclosure to the appellants. We further agree that the information at issue was available to the appellants upon the exercise of due diligence to procure it. Accordingly, we affirm the judgment of Judge Carter dismissing the appellants' claims after trial to the bench.[3]

## I.

A brief summary of the complex pattern of events that give rise to this controversy is in order.

A. *The appellants begin their search for a merger.* The appellants were the principal general partners of Hirsch & Co., a long-established and highly respected brokerage firm with an especially strong reputation in Europe. All three men were wise in the ways of Wall Street as a result of long and prosperous experience.

Like other brokerage houses, Hirsch & Co. came upon hard times in 1969. For the first time in its history the firm registered an operating loss of approximately $2.8 million. Two years earlier the overheated market had entered a state of frenzy; the volume of trading created the most active securities market in American history. The paperwork simply overwhelmed the processing capacity of the industry carried on in the "back offices," and as the market fell in 1969, many firms found themselves in serious difficulty. By the middle of 1969 it became apparent to the appellants that the

[NYSE Report], reprinted in Hearings Before the Subcommittee on Commerce and Finance of the House Committee on Interstate and Foreign Commerce, Study of the Securities Industry, 92d Cong., 1st Sess. No. 92–37 Pt. 1, at 14–33; SEC, Study of Unsafe and Unsound Practices of Brokers and Dealers, H.R.Doc.No. 92–231, 92d Cong.2d Sess. (1971), reprinted in part, CCH Fed.Sec.L.Rep., Special Studies 1963–1972, ¶ 74,801 at 65,501; Note, Exchange Liability for Net Capital Enforcement, 73 Colum.L.Rev. 1262, 1263–64.

2. *See* NYSE Report, at 20–21.

3. Prior to trial Judge Carter granted the defendants' motion for summary judgment insofar as the appellants' claim was based on their acquisition of a general partnership interest in du Pont, Glore. Trial consequently proceeded only with regard to the appellants' limited partnership interests.

The parties are in accord that a general partnership interest is not a security within the meaning of the securities acts, particularly where, as here, the general partner plays a leading part in the management of the firm. *S. E. C. v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *New York Stock Exchange , Inc. v. Sloan*, 394 F.Supp. 1303 (S.D.N.Y.1975). The appellants urge that

Kohns's and Mundheim's general partnership interests should be treated as securities for purposes of damages, because they were received in a transaction along with limited partnership interests that were clearly securities. *Cf. Hecht v. Harris Upham & Co.,* 430 F.2d 1202, 1210 (9th Cir. 1970) (where a single fraudulent scheme involves both securities and commodities, a District Court may award damages for the entire loss). We are reluctant to accept this position, since to do so, under these circumstances, would require us to ignore the rationale which has led general partnership interests to be excluded from the scope of the securities laws. In view of our disposition of this case, *however, we are not required to reach this issue.*

It is similarly unnecessary for us to decide whether, under the circumstances presented here, Kohns's and Mundheim's general partnership interests are so intertwined with their limited partnership interests that the latter should no longer be considered securities. Judge Carter's thoughtful opinion demonstrates the complexity of the considerations involved in resolving this question, and we would not venture lightly to intimate our views in so difficult an area.

Hirsch firm was not viable: the heavy trading volumes of the "new" market required sophisticated data processing techniques that were beyond the means of the medium-sized brokerage. Moreover, some major partners of Hirsch & Co.—especially Maurice Meyer, whose interest was second in size to that of Kohns—were withdrawing their capital from the firm, thus aggravating the difficulties inherent in the circumstances creating the market crisis. Accordingly, from the middle of 1969 the appellants began to explore the possibilities of merger with another brokerage. After a number of unsuccessful discussions with other firms, the appellants commenced negotiations with F.I. du Pont in March, 1970.

B. *F.I. du Pont: a giant in trouble.* In 1969 du Pont was the third largest house on Wall Street but, nevertheless in deep trouble. The operating loss posted that year was a staggering $7.7 million, one of the largest ever suffered by a member of the New York Stock Exchange. Such losses inevitably generated capital shortages. Accordingly, in both June and July du Pont found itself in violation of the Stock Exchange's net capital rule, which prohibits a firm's aggregate indebtedness from exceeding 2000% of net capital.[4]

A still more imposing reason for alarm, however, was the utter disarray of du Pont's back office. The firm was censured by the Exchange in the spring of 1969 for record-keeping inadequacies, but this disciplinary action seemed to have had little impact. The level of customer complaints continued to be so high that in October the Exchange and the SEC commenced an investigation of du Pont's operating difficulties.

Against this background of financial and organizational distress, du Pont's accountants, Haskins & Sells, conducted their annual "surprise audit". The auditors' report was rendered as of November 26, and filed with the SEC shortly thereafter. It revealed that, as of September 28, 1969, du Pont was seriously out of compliance with the net capital rule. The ratio of aggregate indebtedness to net capital was 3242%, representing a capital deficiency of approximately $6.8 million. In addition, du Pont had about $30 million in long security count differences and another $7 million in short differences.[5] This information was, of

---

4. NYSE Rule 325. The Rule was designed to assure a core of liquid assets from which a broker-dealer can meet current demands of customers for their funds. *See* SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers,* CCC Fed.Sec.L.Rep. at 65, 521; Note, *Exchange Liability for Net Capital Enforcement, supra* note 1, at 1264–70; Wolfson & Guttman, *The Net Capital Rule for Brokers and Dealers,* 24 Stan.L.Rev 603 (1972). Accordingly, aggregate indebtedness consists of money liabilities adjusted to exclude those which cannot give rise to an immediate demand on the firm's capital, and "Net Capital" for purposes of the rule consists of a firm's net worth less deductions for non-liquid assets. Thus, in 1970, the Stock Exchange deducted from net worth *inter alia,* the value of Exchange memberships, furniture and fixtures, and real property; the value of unmarketable securities, unsecured loans to partners, and unsecured deficits in partner or customer accounts; 30% of the market value of securities long in proprietary accounts and a similar proportion of the excess of short positions over long in proprietary accounts; as well as "[a]ny other amounts rightly to be comprehended as 'Debit Items' in the computation of net capital." Rule

325(b)(4)(J) (NYSE Const. & Rules, April 15, 1970).

F.I. du Pont's net capital ratio in June 1969 was 2181%, in July 2298%.

5. Securities count differences exist when physical inventory of securities on hand fails to tally with a broker's records. Thus, the inability of a broker to locate securities belonging to his customers results in a "short" difference. In contrast, inventories during the 1969–1970 crisis period often turned up securities whose owners could not be determined from the records. These are called "long differences". Evidently, a short difference that persists more than a minimal amount of time represents an immediate liability and must be covered.

The record before us does not reveal the origin of F.I. du Pont's extraordinary securities count differences. Nevertheless, it is helpful to furnish one illustration of the manner in which these differences may be created. For example, let us imagine that 1,000 shares of General Electric are delivered to a purchasing firm. If a back office clerk erroneously punches "Gen Mot" into the firm's computerized stock record, he will simultaneously create a short difference in General Motors stock (the firm's record will indicate that it has 1,000 shares of "GM" it does not have) and a long difference in

course, available to anyone who chose to inspect SEC records and perform the necessary calculations.

The Stock Exchange, dissatisfied with Haskins & Sells's net capital calculation, decided in December to charge net capital for dividend differences. This brought du Pont's capital deficiency, *as of September 28*, to $17.3 million. The recomputed net capital ratio was an astonishing 76,000%. These figures exaggerate du Pont's actual plight, however: since the original deficiency of $6.8 million had been cured by the end of November, the task confronting du Pont in December was to find capital to compensate for the *additional* charge. Nondisclosure of this additional charge and the means by which capital was raised to bring du Pont into net capital compliance by year's end constitute the nub of the appellants' complaint.

C. *The December 16, 1969 conclave.* By any standard, of course, a capital shortage of over $10 million is cause of concern. A meeting was accordingly convened at the New York Stock Exchange on December 16, 1969, for the purpose of discussing F.I. du Pont's difficulties. Among those present were Paul Chenet and Robert Bishop of the Exchange, Samuel Gay and Milton Speicher of du Pont, and Edward Lill of Haskins & Sells. At this meeting Bishop suggested that a special effort be made to resolve long securities count differences by "research," since there existed a substantial likelihood that du Pont actually owned many of the securities in which it had a long position. This suggestion was followed, and by the end of the year du Pont's capital deficiency was eliminated. The liquidation of long differences contributed $6 million to this recovery.

The parties are in vigorous disagreement over whether these differences were actually resolved by "research". We regard this controversy as a quibble over words. On the record before us, there can be little dispute that du Pont resolved some of the differences by tracing them back to the original error and others by a process of elimination—if careful research did not reveal the true owner of the securities in question, it was assumed that du Pont was the owner.

Moreover, it is clear that the Exchange, F.I. du Pont, and Haskins & Sells understood Bishop's use of the word "research" to be broad enough to cover both procedures. Bishop conceded on the stand that, though he expected du Pont to trace the differences in most cases, in

> some instances they might determine the firm owned the securities through exhausting other possibilities.

Samuel Gay, of F.I. du Pont, confirmed this understanding of Bishop's suggestion:

> Q. And so then your position is that if I look through all of these things and I can't find somebody else claiming it, then it is a legitimate long difference?
>
> A. I would say that's so.
>
> Q. And that was the kind of a difference which you thought you could liquidate?
>
> A. That's what I felt that Mr. Bishop meant when he talked about liquidating long differences.

Similarly Edward Lill's contemporaneous memorandum of the December 16 meeting makes it clear that he too understood that du Pont would be selling some securities that had not been traced to a specific error. He wrote:

> It was clearly understood that there would be market risk in such liquidation procedures in that a customer or broker may subsequently claim a liquidated position.

Of course, such risks arise only if differences are resolved by elimination.

Accordingly, the real controversy regarding F.I. du Pont's liquidation of long differences is not over the thoroughness of the firm's research. Rather, the question posed

General Electric shares (the firm will have 1,000 shares of General Electric for which it has no record.) When these differences are valued in dollars, they will not appear to have any relationship to one another. Thus, in our example, the short difference in General Motors may be valued at $68,000, and the long difference in General Electric at $50,000.

by the appellants is whether the process of elimination was a proper technique, especially in light of du Pont's abysmal record keeping, or at least a sufficiently meaningful departure from ordinary practices to require disclosure.

D. *The Hirsch & Co.–F.I. du Pont negotiations: Round I.* In March, 1970, Hirsch & Co. formed a committee to investigate the desirability of a merger with du Pont. The Hirsch firm was, of course, unaware of the results of Haskins & Sells's surprise audit and the means by which du Pont had brought itself into compliance with the net capital rule. But it certainly did not set out upon the merger course in ignorance of du Pont's massive problems. Indeed, in the preceding month the Stock Exchange's investigation of du Pont's operations had resulted in the renewed censure of the firm's record keeping and the levy of a $100,000 fine, one of the largest in the Exchange's history. And, the extraordinary censure and fine were emblazoned in the headlines, just one day after the New York daily newspapers had revealed du Pont's imposing operating loss for 1969. The appellants admitted reading these reports, but the condition of Hirsch & Co. was apparently so unsatisfactory that the possibility of a merger merited pursuing inquiry nevertheless.

Kohns and Mundheim assumed the leadership of the merger committee and directed Hirsch's controller, Frank Gariboldi, to conduct an investigation of du Pont. Gariboldi, after careful consideration, presented to Mundheim a list of documents he considered necessary for an accurate evaluation of the projected merger. Among the papers requested were du Pont's balance sheet, responses to special operations questionnaire, and the "long form" financial questionnaire prepared and certified by Haskins & Sells in connection with the 1969 surprise audit. Mundheim obtained from du Pont every document on the list. Indeed, Judge Carter in a thorough opinion found and it is undisputed, that in the course of Gariboldi's investigation, every document he asked for was provided, and

that Gariboldi had asked for every document he considered necessary at the time.

After obtaining the requested data, Gariboldi prepared a schedule of questions to ask du Pont's controller, Vincent Gentile. These questions were reviewed by Mundheim and Harold Petrillo, a Haskins & Sells partner and personal friend of Kohns, who handled both the Hirsch and du Pont accounts. On the basis of Gentile's answers, Gariboldi reported to Kohns and Mundheim that du Pont's back office was a "bloody mess". He told them that large securities differences existed and that du Pont did not charge the short differences against capital as Hirsch had and as Gariboldi believed should be done. Finally, Gariboldi reported Gentile's disavowal of a reputed $20 million standing commitment from the du Pont family on which the firm could draw. Gariboldi's report was decidedly negative, and when news of the negotiations prematurely reached the Street in April, the discussions were terminated.

E. *The Hirsch & Co.–F.I. du Pont Negotiations: Round II.* The second round of merger talks began late in May. Hirsch & Co., whose fortunes had turned sharply downward after a promising first quarter, felt that a solution to its untenable position had become urgent. And the merger with du Pont now appeared much more attractive because Glore, Forgan, an internationally respected underwriter, was interested in joining the transaction. Glore's underwriting capability promised all the benefits of diversification, and one of its partners, Archer Albright, was considered the perfect man to tackle du Pont's back office snarl.

The principal remaining obstacle to the merger appears to have been uncertainty regarding du Pont's access to additional capital. Shortly after the resumption of negotiations, Hirsch and du Pont partners met at Mundheim's home to discuss the transaction. All the appellants were present. At this meeting, Kohns asked Edmond du Pont whether his firm had a stand-by agreement for $20 million in the event new capital should be needed. Du Pont confirmed the existence of the agree-

ment but noted that $2.5 million had already been used. Kohns then inquired whether F. I. du Pont could raise additional funds if the $17.5 million remaining were exhausted. Du Pont replied, "I can only tell you, Mr. Kohns, that I have never come back from Wilmington empty-handed." Kohns, out of respect for du Pont's honor, refrained from pursuing the matter further. The depth of his concern, however, is suggested by his subsequent solicitation of Petrillo's opinion regarding the reliability of du Pont's assurances. Petrillo replied that du Pont's "word was better than his bond" and offered his own view that the merger would probably work if the newly formed firm had the appropriate back office management.

In June, Kohns requested Gariboldi to bring his earlier report up to date and directed Tom Weil, a Hirsch & Co. partner, to investigate du Pont's operations. Gariboldi noted that du Pont's operating loss in the first five months of 1970 was $9.7 million, a full $2 million more than its loss for all of 1969, and that it had suffered a capital shrinkage of $1.8 million in the few months period since April. Weil's report was equally discouraging. Du Pont's operations appeared to be out of control, and Weil was particularly concerned by the large value of short differences, which could become an immediate charge on capital. Under these conditions, Weil feared du Pont would be unable to meet its short term capital requirements and informed Kohns that he would opt out of any merger.

F. *The merger.* Despite these negative signs, Hirsch & Co. decided to proceed with the transaction. The merger proposal was communicated to Lee Arning, Vice President of the Exchange, whose duty was to satisfy himself that the new firm would be able to comply with the rules of the Exchange. A member of Arning's staff, Frank Dominach, Jr., urged Arning to delay the merger until assurances of additional capital were provided and the deficient operations at du Pont brought under control. Arning rejected Dominach's view. In his

judgment, combined savings, the new business mix, and strengthened management outweighed the negative considerations.

The merger was consummated July 2, 1970. F. I. du Pont assumed all the liability of Hirsch & Co. and received $4.4 million in capital from those Hirsch partners who chose to participate in the transaction. The consideration received by the appellants is summarized in the following table.

| | Salary as an Active Partner | Annuity on Retirement | Partnership General | Interests Limited |
|---|---|---|---|---|
| Hirsch | — | $25,000 | | $400,000 |
| Kohns | $36,000 | $25,000 | $307,000 | $593,000 |
| Mundheim | $36,000 | $25,000 | $307,000 | $593,000 |

The appellants together held a 2.5% interest in the profits of the merged firm, du Pont, Glore. They also had the right to "bail out" as of December 31, 1970, though in that event the proportionate share of the post-merger losses would be charged against their capital.

The appellants promptly applied to the Exchange for approval as partners in the new firm. Each represented on the standard form that he had made the investigation of du Pont he deemed necessary and expressly declared he was not relying upon the Exchange to provide or disclose any information relating to du Pont. All agreed further, that the Stock Exchange should not be liable with respect to their investment in the new firm. The appellants's applications were, of course, approved.

G. *The events thereafter.* Kohns and Mundheim were elected to du Pont, Glore's Finance Committee, a vantage point from which they could clearly perceive the new firm's economic plight. On July 10, the Stock Exchange informed the Committee that du Pont, Glore's capitalization was extremely thin and that further operating losses would endanger the firm's ability to comply with the net capital rule. In addition, Archer Albright, who had been expected to work wonders in the back office, became ill and was unable to play an active part in du Pont, Glore. The appellants, in their frustration, came to the conclusion

that they had been "misled". But, significantly, they did not take any immediate action to rescind the transaction.

In November, however, the annual audit by Haskins & Sells showed du Pont, Glore's capital position to be so strained that the Exchange required the firm to liquidate $10 million of its own securities to maintain its net capital position. The appellants by this time had enough, and decided to invoke the bail-out provisions of the July 2 agreement. On December 3, 1970, they advised du Pont, Glore's Executive Committee of their intention to withdraw their capital from the firm as of December 31.

By this time the New York Stock Exchange was keenly interested in the misfortunes of du Pont, Glore, which appeared in danger of failing unless it received a massive infusion of capital. Negotiations were then pending between Edmond du Pont and H. Ross Perot, a Texas industrialist, for a new investment, and these negotiations were imperiled by the appellants' decision to withdraw their funds. Accordingly, Bernard Lasker, Chairman of the Stock Exchange, telephoned Mundheim to arrange a conference for a review of the situation. After a preliminary meeting with Lasker and Robert Haack, President of the Exchange, Mundheim agreed to a meeting at the offices of his attorney, Proskauer, Rose, Goetz & Mendelsohn. Those present included Lasker, Haack, and perhaps Felix Rohatyn of the Exchange, two representatives of Perot, and all the appellants. Mundheim testified that he was told,

in very direct language that I couldn't get my money out, whether I wanted to or not because the money wasn't there, and that Mr. Perot would not put any money in unless Hirsch money—and he started with me—was left in.

**6.** The defendants other than the Exchange and Haskins & Sells remained parties only to defend cross-claims filed against them by the appellees.

**7.** On the first day of trial, the appellants sought leave to amend their complaint to assert a claim against the Exchange based on § 6 of the Securities Exchange Act of 1934, 15 U.S.C.

Mundheim agreed in principle to leave 75% of his money in the enterprise and to change the form of his investment to subordinated debt. Kohns and Hirsch agreed to a similar compromise, and formal agreements were executed on December 14 embodying substantially these terms.

Unfortunately, du Pont's losses from July 2 to December 31 were revealed by the April 1971 audit to be so great that, as of December 31, "there was no general partner capital left in the du Pont firm, and the limited partner capital had been at least substantially impaired, if not totally eliminated." The appellants' loan to the firm was now valueless.

H. *Legal Action.* The appellants in 1972 resorted to the federal courts to recover their losses. The complaint alleged violations of § 17 of the Securities Act of 1933, 15 U.S.C. § 77q, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and rule 10b–5, 17 C.F.R. § 240.10b–5, as well as common law fraud. The initial array of defendants included F.I. du Pont partners Edmond du Pont, Wallace Latour, and Milton Speicher, the du Pont firm and its successors, Haskins & Sells, and the New York Stock Exchange. Pursuant to the settlement of a parallel state lawsuit, however, the appellants' claims against all the defendants save Haskins & Sells and the Exchange were dismissed.[6]

One year prior to trial, Judge Carter ruled that only the limited partnership interests received by the appellants in connection with the merger were "securities" within the meaning of the securities acts *Hirsch v. du Pont,* 396 F.Supp. 1214 (S.D.N.Y.1975). After a seven-day bench trial in June, 1976,[7] the Judge dismissed the appellants's claims in their entirety. He held that neither the Exchange nor Haskins &

§ 78f. The trial judge denied leave to amend on the grounds that it would be prejudicial to force the Exchange to defend against the new claim at such a late date and that the appellants' tardiness was inexcusable. In view of our recent decision in *Arneil v. Ramsey,* 550 F.2d 774 (2d Cir. 1977) the appellants have abandoned their § 6 claim on appeal.

Sells had a duty to the appellants to disclose du Pont's 1969 net capital deficiency and the manner in which it was cured. Moreover, this information, in Judge Carter's view, was not material given the appellants's detailed current investigation of du Pont's capital and knowledge of its back office problems, and, even if material, the information was available to the appellants, who did not exercise due diligence to secure it.

## II.

■ A. *Duty to disclose: New York Stock Exchange.*—(1)*Aider-abettor liability.* It is clear that the knowing assistance of or participation in a fraudulent scheme gives rise to liability under § 10(b) as an aider or abettor. *Kerbs v. Fall River Indus., Inc.,* 502 F.2d 731 (10th Cir. 1974). In the case before us, however, the district court found, and it is undisputed, that the New York Stock Exchange did not play a part—not even a minor part—in the merger between Hirsch and du Pont. We are asked to hold, rather, that the Exchange, by failing to disclose du Pont's 1969 capital deficiency and its cure by means of liquidation of the "long" differences not traced to specific errors, furnished substantial assistance to F.I. du Pont's deceptive scheme. The appellants observe that the Exchange stood to benefit from nondisclosure,[8] and they assert that it actively participated in the concealment of du Pont's problems, by failing to suspend du Pont in the autumn of 1969 and by suggesting the liquidation of the long differences in December.

■ We believe the appellants' ingenious effort to force the facts of this case into the mold of aider-abettor liability is fundamentally defective. Judge Carter

found below, on the basis of ample evidence, that

. . . there is little doubt that NYSE was fully entitled to conclude that plaintiffs had fully informed themselves concerning all the facts relating to FID and had decided to go forward with the merger, fully advised of all the facts.

Accordingly, if a fraud was perpetrated on the appellants, the Exchange was unaware of it. We do not believe that the scienter required for rule 10b-5 aider-abettor liability, *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Lanza v. Drexel,* 479 F.2d 1277 (2d Cir. 1973) (en banc) is present where as here, the defendant entertains a reasonable belief that "all the facts" have been fully disclosed.

On this view of the case, the appellants' vigorous argument that inaction from an "improper motive" suffices as a basis of aider-abettor liability, *see Hochfelder v. Midwest Stock Exchange,* 503 F.2d 364, 374 (7th Cir.) *cert. denied,* 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114 (1974), is irrelevant. We need not decide whether, as Judge Carter held, mere inaction can never, absent an independent duty of disclosure, give rise to liability as an aider-abettor, *Wessel v. Buhler,* 437 F.2d 279 (9th Cir. 1971), or whether inaction can give rise to secondary liability if the defendant knows of the fraud and gives "substantial assistance" to the deceptive scheme by his inaction, *Brennan v. Midwestern United Life Ins. Co.,* 259 F.Supp. 673 (N.D.Ind.1966) (motion to dismiss denied), 286 F.Supp. 702 (N.D.Ind. 1968), *aff'd,* 417 F.2d 147 (7th Cir. 1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). In either event, knowledge of the fraud, and not merely the undisclosed material facts, is indispensable.

8. The New York Stock Exchange in 1964 established a Special Trust Fund to aid customers of member firms in liquidation. At the end of 1969 the Fund possessed $15 million, with an additional $10 million stand-by credit. Certainly, the Exchange was interested in minimizing the drain on the Fund, though we note in passing that its assistance program was entirely voluntary.

Beyond the pecuniary interest, the Exchange had every reason to fear the collapse of a giant like du Pont would lead to other failures, thus threatening the continued existence of the securities industry in its present form. But, of course, this concern hardly deviates from what might reasonably be supposed to be the interest of the investing public.

■ (2) *Independent duty of disclosure.* We believe that the law is clear that the New York Stock Exchange does not have a general obligation requiring it to disclose to member firms in merger negotiations all that it knows about each participant. Although the Exchange has important duties toward the public in our system of supervised self-regulation, *see Arneil v. Ramsey,* 550 F.2d 774 (2d Cir. 1977), it has never been conceived as an organization founded to guarantee fair dealing in its *members'* relations with one another. As we have indicated, its raison d'être is to see that the members's responsibility to the public is observed.

■ The appellants attempt to derive a duty of disclosure from the Exchange's conceded duty to enforce its net capital rule.[9] According to the appellants, the Stock Exchange abused its discretion in permitting F.I. du Pont to cure its substantial 1969 capital deficiency by liquidating the long differences. Indeed, the appellants suggest, the Exchange may have permitted its own interest in avoiding du Pont's collapse to override its broad regulatory duty to the public. We are asked to conclude that the Exchange violated a legal duty in failing to suspend du Pont and so inform the appellants of the firm's poor financial condition.

We are not convinced that the New York Stock Exchange was unreasonable in failing to suspend the nation's third largest brokerage for incurring a capital deficiency under the circumstances present here. As of the December 16, 1969, conclave, when the Exchange told du Pont it would charge capital for dividend differences, the initial deficiency had been cured by methods apparently above reproach. Moreover, the research program Bishop suggested did not necessarily place primary reliance on the "elimination" rather than the tracing method of resolving differences. It is unclear from the record what proportion of the differences were traced to the initial errors. And, leaving to one side the problems of disclosure, liquidation of the long differences arguably makes more sense than permitting the certificates to disintegrate, lost in the back office. Such a policy gives rise to the risk of future claims,[10] but we doubt the public is better served by the immobilization of needed operating capital.

■ Moreover, as we have attempted to indicate, the Stock Exchange's duty to enforce its own rules is owed to *public investors.* Insiders like the appellants are well able to protect themselves. In this connection, we have held that limited partners in a member of a stock exchange may not assert a claim under § 6 of the Securities Exchange Act of 1934, 15 U.S.C. § 78f, based on the exchange's failure to enforce its rules. *Arneil v. Ramsey, supra,* at 783. The interests of public investors and customers of a brokerage may often clash with those of private investors. Such conflict could scarcely be more evident than it is here, where the Stock Exchange's attempt

9. We do not believe the appellants's effort to ground the Exchange's liability on its obligation to enforce § 8(b) of the Securities Exchange Act, 15 U.S.C. § 78h(b), *repealed,* Securities Acts Amendments of 1975, § 5(2), P.O. 94–29, 89 Stat. 97 (1975), adds any force to their argument Section 8(b) prohibited any member of an exchange

To permit in the ordinary course of business as a broker his aggregate indebtedness to all other persons . . . to exceed such percentage of the net capital (exclusive of fixed assets and value of exchange membership) employed in the business, but not exceeding in any case 2000 per centum, the Commission may . . . prescribe . . .

Nothing in the statutory language purports to restrict the exchange's discretion in the choice of remedies for violation of this net capital requirement, and we believe the considerations that dictate reasonable deference to good faith disciplinary efforts by the exchanges seeking to discharge a statutory obligation to enforce their own rules, *see Hughes v. Dempsey-Tegeler & Co.,* 534 F.2d 156, 170 (9th Cir. 1976), apply equally to the enforcement of a similar rule prescribed by statute.

10. Although the record is not entirely clear, we have little basis for believing that a substantial portion of du Pont's liquidation of the long differences returned to haunt its successor, du Pont, Glore. We might add, *en passant,* that we doubt du Pont's policy of liquidation contributed materially to the capital shortage that ultimately consumed the appellants's investment.

to encourage a solution to du Pont's capital problems may very well have been in the interest of du Pont's customers, even though immediate suspension would have saved the appellants from a serious mistake. Our holding in *Arneil* was intended to assure that the Stock Exchange's undivided loyalty is to the public investor. We will not undermine the achievement of this end by permitting a limited partner to recover under rule 10b–5 *solely* on the basis of an asserted violation of the Exchange's duty of self-regulation, where his recovery under § 6 would be precluded by our decision in *Arneil.*

We conclude that in the absence of any knowledge of du Pont's alleged fraud, or any independent duty of disclosure, the New York Stock Exchange did not violate any obligation to the appellants.

██ B. *Duty to disclose: Haskins & Sells.* (1) *Independent duty of disclosure.* Rule 17a–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.17a–5(c)(2)(ii), adopted in 1972 in response to the very crisis of the securities industry that has given rise to the present action, requires a net capital statement to be included in the information a broker gives its customers. Accordingly, in 1973 the Committee on Stockbrokerage Auditing of the American Institute of Certified Public Accountants indicated for the first time that violations of net capital rules required at least footnote disclosure. AICPA, *Audits of Brokers and Dealers in Securities* 104 (1973). The appellants urge that Haskins & Sells, by failing to disclose du Pont's 1969 net capital violation, deviated from generally accepted accounting principles, and they predicate the accountants' liability on this asserted deviation.

We are not convinced, on the basis of the record before us, that Haskins & Sells's treatment of du Pont's certified statement of financial condition violated generally accepted accounting practices as they stood in 1969. And, of course, Haskins & Sells's memorandum of net capital, which showed both F.I. du Pont's violation of the net capital rule and the initial amount of the deficiency was available to the appellants, had they simply requested it.

██ The appellants suggest that even the memorandum of net capital was deficient, in that it failed to reveal the charges for dividend differences imposed by the Exchange in December, 1969. Of course, an accountant has a duty to correct certified financial statements to reflect newly discovered facts that would make a report inaccurate when made. *United States v. Natelli,* 527 F.2d 311 (2d Cir. 1975), cert. denied, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). But we do not believe this important principle is relevant to the situation presented here. The additional capital deficiency found in December, 1969, was not a "new fact" in the ordinary sense. Rather, the Exchange, exercising its discretion in making the net capital calculation, decided to treat the data reported accurately in the audit in an unexpected way. The significance of the Exchange's decision does not relate to du Pont's financial position as of the audit date but to its obligation to raise new capital two months later, in December. The facts on which the Exchange passed judgment were fully disclosed; only the Exchange's exercise of judgment two months after the audit date was not.

We cannot ignore, moreover, that the appellants, all sophisticated and experienced businessmen, had information from which the violation could easily have been detected. The "long form" questionnaire actually given to Hirsch & Co. was the basis of the net capital calculation, and Frank Gariboldi testified that he could have made his own calculation of the net capital ratio as of September 28, 1969, had he seen any purpose in the exercise. The appellants insist that, since the existence of a capital deficiency was not pointed out to them, they lacked any reason to determine its amount. But, it cannot be gainsaid that a $17 million capital deficiency stood out sufficiently to place the appellants on notice to make further inquiries.

██ We conclude that the appellants did not have a duty to act further to disclose

the existence and amount of F.I. du Pont's 1969 net capital shortfall. The appellants assert, however, that Haskins & Sells's failure to reveal that the deficiency was cured by the liquidation of the long differences violated the firm's admitted duty to assure itself that du Pont's net capital delinquency no longer existed. We believe this argument betrays a fatal confusion regarding what must be disclosed to make du Pont's financial statements accurate *as of the audit date.*

The fact that du Pont was not in compliance with Exchange rules is significant because it suggests the firm might not have been a going concern. But, it is beyond question that the sale of the long differences, together with sizable new capital contributions, brought du Pont into compliance and removed any threat of suspension that may have existed. Of course, the sale of the long differences generates a risk that the firm will subsequently be found short in some securities. But this fact could not have been reported *as of September 28* because the transactions involved did not occur until December. Haskins & Sells's financial statements do not have any bearing on the disclosure of this risk. Accordingly, we agree with Judge Carter that Haskins & Sells did not have an independent duty to disclose either the 1969 net capital violation or its method of cure.

■■■ (2) *Aider-abettor liability.* The appellants urge, nevertheless, that Haskins & Sells may be liable as an aider-abettor, despite the lack of any independent duty of disclosure, because it actively participated in F.I. du Pont's fraudulent scheme. The appellants point, particularly, to the assistance Harold Petrillo gave to Mundheim in reviewing questions to be asked of du Pont's controller, Vincent Gentile, and Petrillo's assurances that Edmond du Pont's word was reliable and that, in his own view, the proposed merger was promising if the right back office management could be found. Judge Carter, of course, found that Petrillo did not participate in the transaction as a representative of Haskins & Sells but as a friend of Kohns and Mundheim.

The appellants assail this finding, noting that their own testimony that they consulted Petrillo on a professional basis was not directly contradicted. Nevertheless, Hirsch & Co. did not retain Haskins & Sells to aid its investigation of F.I. du Pont; nor does it appear that Haskins & Sells was ever paid for Petrillo's services. Judge Carter had the opportunity, which we do not, to evaluate the appellants' credibility. We cannot on this record hold his conclusion that Petrillo did not represent Haskins & Sells to be clearly erroneous.

### III.

■■■ We hold that neither the Stock Exchange nor Haskins & Sells were under an obligation to convey information regarding du Pont's 1969 capital deficiency or its liquidation of the long securities count differences. But even if such a duty did exist, we believe that this information was either immaterial or, if material, should have been discovered by the exercise of due diligence.

If we did not have before us a record replete with evidence of the appellants' exhaustive and unrestricted investigation of F.I. du Pont, we might seriously doubt the trial judge's conclusion that the 1969 capital deficiency and its manner of cure were not material. The appellants possessed highly detailed knowledge of du Pont's capital and back office problems. But through Gariboldi's questioning of Gentile and by Kohns's questioning of Edmond du Pont the appellants displayed their deep concern over the availability of capital to sustain F.I. du Pont through the difficult period that obviously lay ahead. Indeed, Kohns was not satisfied even with assurances of a $17.5 million line of credit. The appellants might have regarded the measures taken by du Pont in 1969 as relevant to their decision to invest.

But, the appellants concededly received from du Pont all the information they asked for. They simply did not consider the 1969 data relevant. Moreover, given the information they possessed, we believe any reasonable investor of the appellants' level of sophistication would have made a further

inquiry. The "long form" questionnaire in Gariboldi's hands revealed a possible massive capital deficiency. Had Gariboldi been interested, he could easily have obtained from du Pont the precise magnitude of the deficiency. Had he done so, he surely would have inquired how the capital required to restore net capital compliance was secured. Gariboldi's failure to pursue this line of investigation suggests either that, despite appearances, the knowledge he would have discovered was immaterial, *see Titan Group, Inc. v. Faggan,* 513 F.2d 234 (2d Cir. 1974), *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975), or that Gariboldi failed to exercise due diligence *to* obtain important information, *see Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 409–10 (2d Cir. 1974), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976).

The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment. Such investors must, if they wish to recover under federal law, investigate the information available to them with the care and prudence expected from people blessed with full access to information. We believe that the diligence of the appellants in this case fell far short of the mark.

### IV.

In view of our holding that neither the Exchange nor Haskins & Sells had a duty of disclosure in this case and that the information at issue was either immaterial or should have been discovered by due diligence, we need not tarry long on the following points, which are of secondary importance.

A. *Causation of loss/proof of damages.* The Exchange and Haskins & Sells argue that the appellants's losses were, at least in part, produced by their independent business decision in December, 1970, to leave 75% of their money in du Pont, Glore as subordinated debt. Since by this time the appellants knew all too well the true financial plight of du Pont, Glore, subsequent losses were not caused by any misapprehension as to material facts, and the amount of loss attributable to the period prior to December, 1970, has not, according to the appellees, been shown.

This contention scarcely merits attention. The record shows that by December, 1970, the appellants's capital had already been completely consumed: the appellants's loan to du Pont Glore was revealed by the April 1971 audit to have been valueless. In addition, we think it is hardly fitting for the Stock Exchange to argue at this point that the appellants's decision to accept a change in form of investment was a voluntary "new" business decision. After all, the appellants's decision resulted from heavy pressure from the Chairman of the Board of the Stock Exchange, who informed Mundheim his investment in du Pont could not be withdrawn, both because du Pont was unable to pay and because withdrawal, by jeopardizing negotiations with H. Ross Perot, could cause the collapse of the whole securities industry.

B. *Waiver.* The New York Stock Exchange argues that the appellants are estopped from suing the Exchange by their representation, on the standard form, that they did not rely on the Exchange to provide information regarding the merger. We interpret the standard form as merely emphasizing the lack of any general duty on the part of the Stock Exchange to provide investment information to those who become partners in its members. Indeed, the appellants do not assert any such general duty. We do not read the agreement as constituting an anticipatory waiver of a claim of aider-abettor liability, *cf.* § 29 of the Securities Exchange Act, 15 U.S.C. § 78cc, and, accordingly, we find no estoppel raised by it.