RESOURCE INVESTORS GROUP, an Illinois partnership, Plaintiff,

v.

NATURAL RESOURCE INVESTMENT CORP., a Delaware Corporation, POM Corp., a Michigan Corporation, International Mining & Petroleum Co., a Delaware Corporation, Manufacturers National Bank of Detroit, a national banking corporation, and RSA Corporation, a Michigan Corporation, Defendants.

Civ. A. No. 6–70367.

United States District Court, E. D. Michigan, S. D.

Aug. 15, 1978.

Sherwin D. Abrams, Solomon, Rosenfeld, Elliott, Stiefel & Engerman, Chicago, Ill., Frank S. Galgan, Freud, Markus, Slavin, Toohey & Galgan, Troy, Mich., for plaintiff.

George G. Kemsley, Bodman, Longley, Bogle & Dahling, Detroit, Mich., for MNB.

Alan R. Miller, August, Thompson, Sherr, & Miller, P. C., Birmingham, Mich., for RSA Corp.

## OPINION

FEIKENS, District Judge.

Plaintiff Resource Investors Group (RIG), an Illinois partnership, filed suit in the Northern District of Illinois against Natural Resources Investment Corporation (NRIC), the operator of certain oil and gas interests, POM Corporation (POM), a drilling concern, International Mining & Petroleum Co. (IMPCO), a prospective successor corporation to POM, RSA Corporation (RSA), the purchaser of some of POM's assets, and Manufacturers National Bank of Detroit (MNB), an escrow agent, alleging violations of the Securities Exchange Act, Section 10(b) and Rule 10b–5, violations of the Securities Act of 1933, Section 17(a), breach of contract, fraud and negligence. Following MNB's motion to dismiss or transfer, the entire case was transferred to this district. Defendant IMPCO was dismissed by stipulation of the parties, and default judgments were entered against NRIC and POM for failure to appear or answer the complaint.

Plaintiff alleges that in 1971 NRIC and POM jointly offered to sell non-producing working interests in certain oil and gas wells; as part of the solicitation NRIC delivered to plaintiff seventeen prospectuses, each describing an interest in a single well; each prospectus stated that any funds invested would be "set aside in a special escrow account to pay the drilling costs." A copy of an escrow agreement among NRIC, POM, and MNB that had previously been executed accompanied each prospectus. According to the terms of the escrow agreement, the moneys held by MNB as escrow agent, were to be released only upon POM's certification to MNB that a drilling contract had been executed and upon receipt by MNB of a letter from POM stating "the exact commencement date of survey and staking" of each well. MNB agreed that "should a drilling contract not be executed and/or no commencement of drilling set" the funds would be returned to NRIC.

Plaintiff further alleges that in reliance on the prospectus and escrow agreement it paid $93,362.50 to NRIC; that NRIC and POM failed to disclose that they were substantially owned and operated by the same controlling interests and that the contracts between them were not negotiated and entered into in arms-length transactions; that of the seventeen wells in which plaintiff purchased non-producing working interests, only a few were drilled, and out of those few only one or two were in fact completed; and that MNB disbursed funds from the escrow without proper certification or letters from POM stating the commencement date of survey and staking and without drilling contracts having been executed and/or commencement dates of drilling being set.

Finally, plaintiff alleges that RSA was owned and operated by the same controlling interests as POM and acquired the non-producing working interests held by POM in furtherance of a scheme to defraud investors.

The two remaining defendants, RSA and MNB, have filed motions for summary judgment. These motions are granted.

## I.

Taking the complaint, pleadings, and discovery in a light most favorable to plaintiff, they allege a claim against RSA on three possible grounds: (A) Conspiracy; (B) Securities Fraud; (C) Assumption of Liabilities.

A. Count III of the complaint alleges in conclusory terms that RSA aided other defendants in their scheme to defraud plaintiff. Paragraph 27 of the complaint alleges that this is shown by the fact that a year after plaintiff made its investment and after the escrow was depleted RSA acquired POM (which had previously acquired NRIC) for "no valid consideration." In three years of repeatedly extended pretrial discovery periods and pleading plaintiff has produced no evidence of conspiracy or inadequacy of consideration to counter RSA's affidavits

that deny these allegations. Consequently, there is no genuine issue of material fact as to the claim of conspiracy.

■ B. RSA had no relationship with any of the other parties in this lawsuit until one year after plaintiff's purchase. This relationship is insufficient to impose liability upon RSA because it could not have participated in any fraud "in connection with the purchase of sale of any security." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975). Several recent cases have held that conduct occurring after a sale cannot be the basis of liability under section 10(b) or Rule 10b–5. *Ohashi v. Verit Industries*, 536 F.2d 849 (9th Cir. 1976); *Wolford v. Equity Resources Corp.*, 424 F.Supp. 670 (S.D.Ohio 1976); *Kogan v. National Bank of North America*, 402 F.Supp. 359 (E.D.N. Y.1975). Furthermore, the fact that RSA's involvement occurred a year after the sale precludes a finding of scienter which must be based on knowledge and is an essential element of a 10b–5 claim. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Wolford, supra.*

■ Count IV alleges a violation of the Securities Act of 1933, section 17(a), 15 U.S.C. 77q(a), which makes it unlawful to use or employ any manipulative or deceptive device or contrivance or to use any untrue statement or material omission to accomplish the purchase or sale of any security.

RSA did not participate in the preparation of any prospectus nor in any negotiations with plaintiffs. In *Kogan, supra* at 361, the court stated:

Section 17(a) of the Securities Act of 1933 is even narrower than Rule 10b–5 in that the fraud must actually be in the offer or sale itself, rather than in connection thereto.

Plaintiff can show no set of facts to support a claim of securities fraud against RSA.

C. Finally, plaintiff seeks to base a claim of liability upon RSA's express assumption of the liabilities of POM. However, no such theory of liability on the part of RSA was previously advanced by plaintiff; no such theory is stated in the complaint nor in the letter to the court of November 2, 1976. Consequently, no discovery was conducted concerning this theory. Plaintiff does not cite cases that hold that liability for fraud can be assumed. But most important is the exception that appears in the very provision of the agreement between RSA and POM to which plaintiff points to establish an express assumption of liability. Section 1.2(b) of the agreement states:

. . . provided, however, that liability and obligations resulting from any violations of Federal or State securities laws by POM are not included in this RSA undertaking.

Because there is no genuine issue of any material fact as to any claims against RSA it is entitled to judgment as a matter of law. RSA's motion for summary judgment, accordingly, is granted.

## II.

Plaintiff bases its suit against MNB on three theories: (A) Breach of the escrow agreement of which plaintiff was allegedly a third-party beneficiary; (B) Negligence; and (C) Violations of Rule 10b–5 and Section 17(a) of the Securities Act of 1933 as an aider and abettor.

■ A. Plaintiff was not a party to the escrow agreement, nor are any other relationships or communications between plaintiff or any of its partners and MNB alleged. Plaintiff is not named or described in the agreement. Consequently, the viability of any claim plaintiff makes under the escrow agreement among NRIC, POM and MNB depends upon whether or not it was an intended third-party beneficiary of the agreement.

The breach of contract claim is a state law claim and is governed by Michigan law since the contract in question was executed and was to be performed in Michigan. The right of a person to enforce a contract to which he is not a party is provided for by statute in Michigan. MCLA 600.1405 provides in relevant part:

Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.

(1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or refrain from doing something *directly to or for* said person. [emphasis supplied]

The Michigan Supreme Court has considered the applicability of this statute to a contract, similar to the one at bar, in which the alleged beneficiary is not specifically named. In *Guardian Depositors Corp. v. Brown*, 290 Mich. 433, 437, 287 N.W. 798, 800 (1939) the Court stated:

The standard which the legislature has prescribed for determining when a "promisor * * * has undertaken" to perform or refrain from performing a given act, we think, is an objective one, determined from the form and meaning of the contract itself.

The escrow agreement in this case is a written document to be construed as a matter of law. The determination that must be made is whether the form and meaning of the agreement as evidenced by the objective manifestation of the parties establish an undertaking by the promisor to assume a direct obligation to the third-party beneficiary. The requirement of MCLA. 600.-1405(1) that the promise be undertaken "directly to or for" the beneficiary is designed to insure that the third-party is an "intended," rather than an "incidental" beneficiary. In *Guardian Depositors Corp., supra* at 437–438, 287 N.W. at 800, the Michigan Supreme Court described the required relationship as follows:

"The name of the person to be benefited by the contract need not be given, if he is otherwise sufficiently described or designated. Indeed, he may be one of a class of persons, if the class is sufficiently described or designated." *Burton v. Larkin*, 36 Kan. 246, 13 P. 398, 59 Am.Rep. 541.

Even in jurisdictions holding to the so-called "intention rule," which was favored by the trial court, it is immaterial that the actual intent of the promisee was to protect himself from paying the debt to the third person if the parties did in fact contemplate that the promisor should assume a direct obligation to the beneficiary.

The agreement in this case does not sufficiently describe or designate anyone as a third-party beneficiary. Except for NRIC, POM and MNB, the parties to the agreement, no person, business entity or class of persons or entities is described or designated. The obligations undertaken by MNB run only to POM and NRIC. The oblique reference in the Bank's disclaimer of liability to "any other party" is certainly an insufficient ground for finding that MNB objectively manifested an intent to assume a direct obligation to plaintiff. Plaintiff has no right to enforce the terms of the contract.

In addition to the lack of any reference to plaintiff or any other third-party beneficiary in the contract, there are other factors which demonstrate that plaintiff was not a party or an intended beneficiary. The money invested by plaintiff was paid directly to NRIC. If NRIC had simply misused this money rather than depositing it with MNB, the Bank would not be liable to plaintiff. The fact that NRIC did deposit the money is not a sufficient ground for imposing liability on MNB. Secondly, the escrow agreement specifically provides that if a drilling contract was not executed and/or no commencement of drilling set, the escrow funds would be returned to NRIC, not to plaintiff. Finally, the intention of plaintiff and of the parties to the agreement must be construed in the context of paragraph 34 of the prospectus which provides:

State what assurance the purchaser of interest hereby offered has that the proposed well or wells will ever be drilled or completed:

The integrity and financial ability of the offeror is the only assurance that such a well will be drilled and if successful, com-

pleted. The purchasers of the interests hereby offered will be furnished a copy of completion form, if production is obtained, or a copy of plugging report if a dry hole. If the well is not drilled, all funds will be refunded, with no liability accruing to either party.

Plaintiff was clearly advised that its only assurance was the integrity and financial ability of the offeror, and any reliance upon an obligation of MNB supposedly undertaken in the escrow agreement would have been unjustified.

The cases cited by plaintiff are clearly distinguishable. *Chatham Super Markets, Inc. v. Ajax Asphalt Paving, Inc.*, 370 Mich. 334, 121 N.W.2d 836 (1963) deals with an unnamed third-party beneficiary, but in that case the plaintiff was to be the owner of the supermarket for which the defendant as a subcontractor was to do the paving work. In light of the fact that the plaintiff was the only party that would be ultimately benefited by the performance of the work the Michigan Supreme Court stated that a dismissal for the lack of affidavit[s] was improper. In this case there is an operator and a driller who entered into a contract with a bank for their mutual benefit, and unlike the *Chatham* case, any benefit to the plaintiff was incidental.

In *Greenlees v. Owen Ames Kimball Company*, 340 Mich. 670, 66 N.W.2d 227 (1954) the Court held that a furrier, who was a tenant in a building for which the defendant construction company contracted to do certain remodeling work, was entitled to maintain an action for damages caused by dust under the third-party beneficiary statute, where the contract between the landlord and the defendant provided for performance of the work in such a way as to cause a minimum of disturbance to the daytime operations of the building. The Court held that since the plaintiff was a member of the class directly affected by the provision, the contract was admissible and could establish a basis for liability. The furrier in that case was clearly within the group of businesses for whose exclusive benefit this contract provision was intend-

ed. In contrast, the instant agreement was for the direct benefit of the parties thereto, and any benefit to plaintiff was only incidental.

■ B. Plaintiff's theory of negligence is based upon the premise that when the Bank entered into the escrow agreement, it incurred a duty to exercise due care to prevent injury to all non-parties who might foreseeably be injured by the Bank's negligent performance of its contractual undertakings. This duty to third persons to guard against the negligent performance of a contract is said to be found in certain cases of the Michigan appellate courts.

Plaintiff relies on *Clark v. Dalman*, 379 Mich. 251, 150 N.W.2d 755 (1967) and *Talucci v. Archambault*, 20 Mich.App. 153, 173 N.W.2d 740 (1969). These cases, however, deal with physical injury to persons who were required to be on the premises caused by the negligent performance of a contractual undertaking between an independent contractor and the owner of the property. These cases should be limited to their particular fact situations. In *Clark* there was a contract between a city and the defendant for the repair, cleaning, and painting of the city's elevated water storage tank. A provision in the contract required the defendant to notify an engineering firm retained by the city when various phases of the work were to commence so that an engineer could be sent to inspect the work done during the previous phase. The Michigan Supreme Court held that the defendant's failure to notify the plaintiff inspector that an extremely slippery substance had been applied presented a negligence question for the jury. In *Talucci* the plaintiff's employer had contracted with defendants for the removal of snow from the employer's premises for the purpose of providing a safe and convenient means of ingress and egress to its building for its employees. The plaintiff alleged that defendants' failure to perform their contractual obligations resulted in his being injured when he slipped and fell on an accumulation of ice and snow covering a passageway to the employer's building. The Michigan Court of Appeals held that if

plaintiff could prove certain facts about the intent of the contracting parties he would have a cause of action as a third-party beneficiary under the contract. The court also stated that there could be a duty of due care owed by defendants to plaintiff arising out of their undertaking to keep the passageways clear and safe.

Neither of these cases nor any other cases apply the "negligent performance of a contract" theory to find a duty owed to a non-party in a situation other than foreseeable physical injury to a legitimate user of the premises. This theory is limited to such fact situations; they are the only situations in which the relationships of the parties create a duty. No such duty exists in the situation here involved; there is no relationship on which a duty can be premised, and thus it is not necessary to discuss the manner in which MNB performed the contract, nor to discuss questions of duty and breach.

■ C. Plaintiff urges that its allegations of reckless conduct and non-disclosure on the part of MNB satisfy the scienter requirements of Rule 10b–5 and Section 17(a) of the Securities Act of 1933 and preclude the granting of summary judgment on its claim that MNB aided and abetted POM and NRIC in the commission of securities fraud. All the cases that plaintiff cites in which liability was found, however, deal with defendants who were actively involved in the purchase or sale of securities. As discussed *above*, MNB had no relationship whatsoever with plaintiff, and therefore no duty to disclose anything to plaintiff can be found. In the absence of some relationship which generates such a duty there can be no liability for mere possession of information and nondisclosure. See *e. g.*, *Gold v. DCL, Inc.*, 399 F.Supp. 1123, 1127–28 (S.D.N.Y.1973); *Rothschild v. Teledyne, Inc.*, 328 F.Supp. 1054, 1056 (N.D. Ill.1971); *Murphy v. McDonnell & Co., Inc.*, 553 F.2d 292, 295 (2d Cir. 1977).

■ The fact that MNB did not "knowingly and substantially assist" in the violation of any securities law also precludes any secondary liability for the violation of oth-ers. *S.E.C. v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). Furthermore, any claimed recklessness on the part of the Bank could only have occurred some time after plaintiff purchased an interest in NRIC's assets and is irrelevant to the claims of securities fraud.

The court in *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95 (5th Cir. 1975), citing *Coffey, supra,* states:

> The scienter requirement scales upward when activity is more remote; therefore, the assistance rendered should be both substantial and knowing. A remote party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud.

The case describes how this standard should be applied in a situation similar to the case before this court.

> When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high "conscious intent" variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter. [citations omitted] In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability without the clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability. In any case, the assistance must be substantial before liability can be imposed under 10b–5. *Id.,* at 97.

The application of a recklessness standard is discussed in *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir. 1978). In that case it is held that there must be a fiduciary duty and conduct very close to fraud to impose secondary liability:

We need not reach the question whether recklessness satisfies the scienter requirement where the alleged aider and abettor owes no duty of disclosure and of loyalty to the defrauded party. See *Hirsch v. du Pont*, 553 F.2d 750, 759 (2d Cir. 1977). *Id.*, at 44 n.9.

The court continues with a description of a situation in which this standard might apply:

> The relationship most logically subjected to a recklessness standard, rather than some stricter standard involving proof of intent to defraud, is where the aider and abettor owes a direct fiduciary duty to the defrauded party. See *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975). Liability premised on the recklessness of one's fiduciary in failing to perform his duty to disclose is a far cry from awarding damages for simple negligence. See *Ernst & Ernst v. Hochfelder, supra. Id.*, at 45.

The absence of any relationship or dealings between MNB and plaintiff precludes the finding of a duty to plaintiff or any liability for the breach of such a duty.

As discussed above in connection with the liability of RSA, Section 17(a) of the Securities Act of 1933 is even narrower than Rule 10b–5, and plaintiff has no claim against MNB under that section. See *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 795–96 (7th Cir. 1977).

### III.

To conclude, there are no fact allegations to support the claim that RSA participated in a scheme to defraud plaintiffs. Since RSA was in no way involved in the purchase or sale of any interests to plaintiffs and did not transact any business with any of the parties until one year after the purchase of an interest by plaintiff it could not have participated in any fraud "in connection with the purchase or sale of any security." Nor did RSA expressly assume liability for any securities fraud of POM. Consequently, RSA's motion for summary judgment is granted.

Plaintiff was not a party to the escrow agreement nor was it an intended third-party beneficiary, and it, therefore, has no rights against MNB under that agreement. No relationship existed between MNB and plaintiff that would give rise to a duty of due care on the part of MNB, and as a result, it is not necessary to examine whether or not MNB was negligent in its performance of the escrow agreement. Finally, since no fiduciary relationship or any other relationship existed between MNB and plaintiff, MNB had no duty to disclose information and could not be secondarily liable for the securities fraud of others. MNB is entitled to judgment as a matter of law, and its motion for summary judgment is granted.