WESTLAND ENERGY 1981–1 LTD., a Utah Limited Partnership, et al., Plaintiffs,

v.

BANK OF COMMERCE AND TRUST COMPANY, et al., Defendants,

v.

Kristine G. PINEGAR, Third Party Defendant.

No. 83–C–1025–B.

United States District Court, N.D. Oklahoma.

Dec. 10, 1984.

Sam P. Daniel, Jr., Richard P. Hix, S. Douglas Dodd, Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Okl., Jay D. Gurmankin, Wendy A. Winterholler, Giauque & Williams, Salt Lake City, Utah, for plaintiffs.

Mike Barkley, Dan W. Ernst, Andrew S. Hartman, Barkley & Ernst, Tulsa, Okl., for Bank of Commerce.

Craig W. Hoster, Baker, Hoster, McSpadden, Clark & Rasure, Tulsa, Okl., for Rice, Newport Oil & Emerald Bay.

Joel L. Wohlgemuth, Norman, Wohlgemuth & Thompson, Tulsa, Okl., for Hurricane, HEC Sweet.

## ORDER

BRETT, District Judge.

The Court has for consideration the Motion of Defendants Bank of Commerce and Trust Company (Bank), Leonard D. Rice (Rice), Hurricane Energy Corporation (Hurricane) and HEC Supply Company (HEC) to Dismiss Amended Complaint; Motion of Defendants, Emerald Bay Energy, Inc. (Emerald), Newport Oil & Gas, Inc. (NOG), and Leonard D. Rice (Rice) to Dismiss Amended Complaint; Second Motion to Dismiss of Defendants HEC and Hurricane;

Application of Defendants Bank, Sweet, Hurricane and HEC for Security for Costs; Motion of Plaintiffs for, and Defendants' Counter Motion for, Partial Summary Judgment on the Fourth and Fifth Counterclaims of Defendant Bank; Motion of Plaintiffs to Strike Affidavits of Sweet; and various discovery motions.

Plaintiffs Westland Energy 1981–1 Ltd. (Westland) and Newport Energy 1982–1 Ltd. (Newport) are limited partnerships formed for the purpose of acquiring, drilling and developing oil and gas properties. Plaintiff James C. Pinegar (Pinegar) is president of Westland Energy, Inc. (WEI) and Plaintiff Newport Energy, Inc. (NEI). WEI is one of two corporate general partners of the Westland Limited Partnership. Defendant NOG is the other general partner of Westland. NEI is the corporate general partner of the Newport Limited Partnership. Pinegar is also a limited partner in the Westland Partnership. The remaining Plaintiffs are limited partners in either the Westland Limited Partnership or the Newport Limited Partnership.

The Amended Complaint contains 19 counts in which claims are asserted against Defendants for primary and secondary violations of federal and state securities laws, violations of Oklahoma banking laws and various common law torts. Count I alleges claims against Rice, Bank and Sweet for primary liability for violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5. Count II alleges claims against Rice, Sweet and the Bank for violation of Section 17(a) of Securities Act of 1933. Count III alleges claims against Bank, Sweet, HEC and Hurricane for liability for aiding and abetting under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5. Count IV alleges a claim against the Bank as a controlling party of Sweet under Section 20 of the Securities Exchange Act of 1934. Count V alleges that the Westland and Newport Limited Partnerships and Pinegar undertook certain liabilities and executed certain promissory notes to the Bank, and that under Section 29(b) of the Securities Act of 1934, Plaintiffs are entitled to a judicial declaration that their promissory notes and any other agreements arising out of the illegal securities transactions are void. Counts VI through XIX are pendant state law claims.

In support of their Motion to Dismiss, Defendants contend that Plaintiffs Amended Complaint must be dismissed pursuant to Rule 12(b)(6); that it fails to comply with the requirements of Federal Rules of Civil Procedure 8 and 9; that it fails to allege facts sufficient to permit permissive joinder; and that upon dismissal of the federal claims, the pendant state claims should also be dismissed. (Memorandum Brief in support of Motion to Dismiss Amended Complaint filed April 5, 1984 at Page i). In particular Defendants claim that "[a] close examination of plaintiffs' Amended Complaint will reveal its Rule 8 and 9 deficiencies"; that "[i]t contains no short and plain statement, pleaded with particularity, putting the defendants on notice of wrongs they have committed *with respect to each plaintiff.*" (*Id.* at 5) (emphasis in original)

Defendants describe as "meaningless" Plaintiffs' allegations at Page 22, Paragraph 49 that "Defendants Rice, Bank of Commerce and Sweet in connection with the purchase and sale of the aforesaid securities, used the mails and instrumentalities of interstate commerce and otherwise caused to be disseminated to Plaintiffs materially misleading offering materials, sales information and other communications." This paragraph is preceded by 48 other paragraphs. Paragraph 47 incorporates by reference the allegations of Paragraphs 1 through 46. Paragraph 48 states that "[t]he limited partnership interests purchased by the limited partners of the Westland and Newport Partnerships and the promissory notes issued by the two partnerships to Bank of Commerce are securities within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934...."

Paragraphs 15 through 46 are factual allegations with respect to Rice, Bank and Sweet and are incorporated by reference in

Count I of the Amended Complaint to support the conclusory allegations in Paragraph 49. Plaintiffs allege that Rice and a person by the name of George E. Hall (Hall) purchased certain oil and gas leases (Bird Creek property) in Oklahoma for $1,050,000; that Rice and Hall paid $50,000 as a deposit on the Bird Creek property; that they paid $600,000 at the closing and executed a promissory note for $400,000 secured by a mortgage against the property in favor of the sellers; that the note was to be paid by January 5, 1982; that prior to closing on or about March 16, 1981 Rice and Hall had borrowed the $600,000 down payment from the Bank on an unsecured promissory note for $600,000 together with an agreement to pledge the Bird Creek property to the Bank; that Sweet was instrumental in arranging the unsecured loan for Rice and Hall; that on or about July 1, 1981 Hall and Rice assigned their interests in the Bird Creek properties to Emerald Bay, a company controlled by Rice; that the loan from the Bank remained the obligation of Hall and Rice; that when the $600,000 note to the Bank matured on August 1, 1981, Hall and Rice failed to pay it; that their joint checking account at the Bank at that time had been approximately $10,000 overdrawn for a month; that on August 25, 1981, Sweet, on behalf of the Bank, wrote to Rice and Hall informing them that renewal of the note was conditional upon the Bank's receiving a firm investment underwriting commitment no later than September 1, 1981; that the Bank's letter also advised Hall and Rice that interest due through August 24, 1981 was $19,800; that Rice and Hall did not provide the Bank with the required underwriting commitment, and that on September 25, 1981 the Bank's lawyers wrote to Rice and Hall advising them that the Bank desired immediate payment of all sums due, including the $600,000 principal amount of the note, interest through September 24, 1981 of approximately $31,000 and the approximate $10,000 in overdrafts remaining on their joint account since July 2, 1981; that the $600,000 loan was not paid as demanded and the Bank's note remained unsecured; that the $400,000 note to the owners of the Bird Creek property was due in 90 days; that Hall and Rice had no foreseeable means to pay either obligation; that if the owners of the Bird Creek property foreclosed their mortgage, the Bank would have been unable to secure its $600,000 note with the Bird Creek property as contemplated by the agreement to pledge. (Amended Complaint, Paragraphs 15 through 20, Pages 7–9)

Plaintiffs further allege that the Defendants, except HEC which was not yet formed, conspired to engage in and did engage in a fraudulent plan by which Rice could obtain funds to satisfy his obligations to the Bank and to the owners of the Bird Creek property; that the plan would provide a pool of money which Rice and Sweet could divert to their own benefit and use and to the benefit and use of the company's owned or controlled by Rice and Sweet; that the plan was to raise funds from investors by selling interests in the limited partnerships (Westland and Newport Partnerships) which would be set up ostensibly to drill for oil and gas on the Bird Creek properties; that in fact, the defendants knew and intended that the funds would be used for other purposes; that HEC also participated in the fraudulent plan once it was formed.

Plaintiffs further allege that in furtherance of the plan, Rice solicited Pinegar to sell limited partnership interests in the Westland and Newport Limited Partnerships; that Rice misrepresented to Pinegar that he was a multimillionaire with extensive experience and success in drilling oil and gas wells, and that Pinegar and other investors could make substantial sums of money by investing with Rice to drill on and develop the Bird Creek property; that as an integral part of the conspiracy and scheme to defraud, the Bank, through Sweet, committed itself to lend the Westland Limited Partnership the principal amount of $606,546 for the ostensible purpose of financing the partnership's drilling activities in the Bird Creek field; that prior to making the loan commitment, the Bank

required that the limited partnership offering circular be submitted to it for approval; that as a further condition of the loan, the Bank required each investor subscribing to the partnership to issue a letter of credit drawn on his or her individual bank in favor of the Bank of Commerce in an amount equal to 75 percent of each investors subscription as security for the partnership loan; that the Bank also required the limited partners to execute assumptions of personal liability for the partnership loan; that the offers and sales of the limited partnership interests to the Westland limited partners could not have been made without the participation of the Bank; that the Westland Partnership offering closed on December 19, 1981 and the partnership issued a promissory note to the Bank of Commerce in the amount of $606,546 on that date.

Plaintiffs further allege that in connection with the offer and sale of the Westland Limited Partnership interests, Rice, Sweet and the Bank, as an integral part of the conspiracy and scheme to defraud, and to induce Westland to issue its promissory note, willfully, knowingly, and intentionally or recklessly made certain false and misleading statements of material facts, and omitted to disclose material facts to Pinegar, the investors and Westland. These allegedly false and misleading statements and omissions of material facts are set forth in subparagraphs (a) through (i) of Paragraph 26 wherein it is alleged that it was falsely represented in the Westland Drilling Program Private Placement Memorandum (the "offering circular"), which was approved by the Bank and provided to each investor, that Rice and his company, NOG, had extensive experience with and knowledge about oil and gas operations and that in the year prior to the offering they had drilled 21 wells, all of which had been commercially productive; that the offering circular stated that the partnership funds would be used for intangible and tangible drilling expenses, administrative and leasehold expenses, geological and geophysical surveys and a reserve for contingencies, including debt service on the partnership loan; that the offering circular omitted to disclose that the Bank, Rice and Sweet intended to wrongfully divert funds from the partnership to benefit themselves and companies owned by them as well as the Bank; that Rice and the Bank omitted to disclose that Rice was in default on a $600,000 obligation to the Bank at the time of the offering and that the Bank was not secured on said obligation; that Rice, Sweet and the Bank omitted to disclose that they intended that part of the Westland partnership drilling funds would actually be used to pay off the balance owing on the purchase price of the Bird Creek property so that the first mortgage held by the owners of the property would be released rather than foreclosed, and the Bank could then secure its $600,000 loan to Hall and Rice; that Rice, Sweet and the Bank omitted to disclose that Rice's accounts and the accounts controlled by him at the Bank were chronically overdrawn; that the Bank had honored checks presented against insufficient funds; that the Bank had demanded that Rice satisfy all his obligations and bring his accounts current; that Rice and Sweet omitted to disclose that in October, 1981, they drafted a private placement agreement to drill four wells on property owned or leased by Sweet or his company, Hurricane; that Rice and Sweet omitted to disclose that NOG, as the operator of the drilling activities in the Bird Creek field would buy equipment from companies owned by Sweet, enabling Sweet to realize profits from partnership funds; that Rice omitted to disclose that the intended to commingle Westland funds and production with funds and production of other partnerships; and that Rice, Sweet and the Bank omitted to disclose that they intended to misappropriate and divert partnership funds to their own use and the use of companies owned by them. (Amended Complaint, Pages 11–13)

Plaintiffs further allege that Rice, Sweet and the Bank owed a duty to the Plaintiffs to disclose the aforementioned facts which they failed to disclose; that on December 30, 1981, NOG paid the owners of the Bird

Creek property a total of $728,000; that on January 8, 1982 the owners of the Bird Creek property released their mortgage, and that on January 12, 1982, the Bank recorded its first mortgage against the property to secure its $600,000 loan, which loan had been reissued on January 1, 1982 in the name of Emerald Bay; that only after the Westland partnership was funded did Rice have the means to pay the owners of the Bird Creek property and provide the Bank with security for the $600,000 loan; that from December, 1981 through June, 1982 Rice and Sweet continued to divert and misappropriate partnership funds for their own use and benefit and for the benefit of entities owned or controlled by them; that although the Westland partnership paid Rice's company, NOG, over $500,000 to drill and complete 7 wells on the Bird Creek property, only one of the wells was drilled and completed as agreed; that in August of 1982, Pinegar, unaware of the Bank's, Sweet's and Rice's plan, and hoping to rescue the Westland partnership from financial problems which had been caused by Rice, Sweet and the Bank, personally borrowed an additional $150,000 from the Bank to use to complete the work on the partnership wells; that from December, 1981 through June, 1982, Hurricane and HEC, Sweet's companies, received over $300,000 from NOG. (Amended Complaint, Pages 13-15)

Allegations similar to those made in connection with the Westland partnership are made in Paragraphs 34 through 46 of the Amended Complaint with respect to the Newport partnership where the alleged acts of Defendants Rice, NOG, Bank, Sweet, Hurricane and HEC are set out in support of Plaintiffs' claims of federal securities violations.

■ To support a private cause of action against Defendants under Section 10(b) of the Securities Act, Plaintiffs must allege and prove that such violations occurred in connection with the purchase or sale of securities. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

Section 10(b) of the 1934 Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe...." 15 U.S.C. § 78j(b).

Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated pursuant to Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility or any national securities exchange

(1) to employ any device, scheme or artifice to defraud,

(2) to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

■ The misrepresentation or omissions must be material. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Materiality is an element of common law fraud that is required by the express language of Rule 10b-5(2). In *Mitchell v. Texas Gulf Sulphur Co.,* 446 F.2d 90 (10th Cir.1971), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971), *rehearing denied,* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972), the Court held that "[m]isrepresented or omitted facts become material, hence actionable under 10b-5 when, considering the complaining parties as reasonable investors, the disclosure of the undisclosed facts or candid revelation of misleading facts would affect their trading judgment ..." In the *Affiliated Ute* case, *supra,* 406 U.S. at 153-54, 92 S.Ct. at 1472, the Supreme Court said: "Under the

circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of his decision."

■ A defendant must have acted with some form of scienter beyond mere negligence. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Court defined scienter as "[a] mental state embracing intent to deceive, manipulate or defraud." 425 U.S. 194, Footnote 12, 96 S.Ct. at 1381, footnote 12. In *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the Supreme Court expressly did not "address the question, reserved in *Hochfelder*, ... whether, under some circumstances, scienter may also include reckless behavior." *Id.* at 686 n. 5, 100 S.Ct. at 1950 n. 5. See also *Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir.1981). In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. *Hochfelder, supra*, 425 U.S. at 193–94 n. 12, 96 S.Ct. at 1381 n. 12.

In *Hackbart v. Holmes*, 675 F.2d 1114, 117–18, (10th Cir.1982), the Court stated:

At this time we expressly hold that recklessness satisfies the scienter requirement. We do so for the same reasons given by the other circuits: first, because the Securities Acts are to be broadly construed to achieve their remedial goals, *Mansbach [v. Prescott, Ball & Turben]*, 598 F.2d [1017] at 1024 (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 [92 S.Ct. 1456, 1471, 31 L.Ed.2d 741] (1972); second, because requiring the Plaintiff to show intent would be unduly burdenson, *Thompson [v. Herbert Partridge]*, 636 F.2d [945] at 961 n. 32; *Mansbach*, 598 F.2d at 1025; *Rolf [v. Blythe Eastman, Dillon & Co.]*, 570 F.2d [38] at 47; and third, because the Securities Acts were intended to proscribe actions akin to common law fraud, *see Hochfelder*, 425 U.S. at 212 n. 32 [96

S.Ct. at 1390 n. 32] (reviewing legislative history and finding that the SEC believed the rule would proscribe fraudulent behavior), and reckless behavior satisfies the scienter requirement of common law fraud, *Mansbach*, 598 F.2d at 1024. For purposes of applying Rule 10b–5, the best definition of reckless behavior is conduct that is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the Defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. [v. Sun Chemical Corp.]*, 553 F.2d [1033] at 1045 (quoting *Franke v. Midwestern Okla. Dev. Auth.*, 428 F.Supp. 719, 725 (W.D. Okla. 1976).

In *Franke v. Midwestern Okl. Dev. Authority*, 428 F.Supp. 719, 725 (W.D.Okl. 1976), *vacated on other grounds, Cronin v. Midwestern Okl. Dev. Authority*, 619 F.2d 856 (1980), the trial court stated:

In the context of an omissions case, reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even unexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the Defendant or is so obvious that the actor must have been aware of it.

*Accord, e.g., McLean v. Alexander*, 599 F.2d 1190, 1197 (3rd Cir.1979); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir.1979); *Sundstrand Corp. v. Sun Chem. Corp., supra*, 553 F.2d 1033; *Securities & Exchange Com'n v. Southwest Coal*, 624 F.2d 1312, 1321 n. 17 (5th Cir.1980).

■ There must be a causal connection between the claimed violations of Section 10(b) and Rule 10b–5 and the injuries allegedly suffered by the plaintiffs. *Affiliated Ute, supra*, 406 U.S. at 154, 92 S.Ct. at 1472.

In *Titan Groups, Inc. v. Faggen*, 513 F.2d 234, 238 (2nd Cir.1975), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59, the

Court said "[t]he parallel elements of materiality and reliance both serve to restrict the potentially limitless thrust of Rule 10b–5 to those situations in which there exists a causation in fact between the act and the injury.

With respect to "a duty to disclose", the Court in *Woods* stated:

Plaintiffs contend that the bank is primarily liable because it had a duty to disclose material misrepresentations and omissions directly to the bondholders. If true, silence or inaction could lead to a finding of Rule 10b–5 liability. *Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 739–40 (10th Cir.1974). The trustee bank maintains that it had no duty of disclosure to the bond purchasers. *Resource Investors v. Natural Resources Inv. Corp.*, 457 F.Supp. 194, 200 (E.D.Mich. 1978). However, the Tenth Circuit recently reversed a trial court's entry of summary judgment for a trustee bank on this issue. *Cronin, supra.* The court indicated that *participation in the issuance of the bonds could result in a duty of disclosure to all buyers.* (emphasis added)

489 F.Supp. at 1278.

The court further stated:

... "[t]he Bank may be subject to primary liability for Rule 10b–5 violations if it owed a direct duty to the public. *Cronin v. Midwestern Oklahoma Development Authority* [619 F.2d 856 (10th Cir. 1980) ] The bank could also be found secondarily liable under an aiding and abetting theory if it has sufficient knowledge of and participation in the rule 10b–5 scheme. *Ibid*

As to the aider-abettor situation, the Tenth Circuit Court of Appeals, with many other circuits, has recognized liability of alleged aiders and abettors under § 10(b) and Rule 10b–5, See *Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731, 740 (10th Cir.1974) [pre-*Hochfelder* ] and *Cronin v. Midwestern Okl. Dev. Authority*, 619 F.2d 856, 862 (10th Cir.1980) [post-*Hochfelder* ]. However, the Supreme Court of the United States, in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, n. 7 (1976), *rehearing den.*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976), declined to determine whether civil liability for aiding and abetting is appropriate under § 10(b) and Rule 10b–5.

■ To support an aiding and abetting claim it must be alleged that (i) an independent wrong existed; (ii) the aider and abettor rendered substantial assistance to the primary wrongdoer; and (iii) the aider and abettor had the requisite scienter. *Woods v. Homes & Structures of Pittsburg, Kansas*, 489 F.Supp. 1270, 1278 (D.Kans.1980); *Troyer v. Karcagi*, 476 F.Supp. 1142, 1151 (S.D.N.Y.1979)

In *Woods*, the Kansas trial court stated in dealing with an aiding and abetting theory against F & M based on the issuance of industrial development bonds:

... The elements of aiding and abetting in a Rule 10b–5 violation are: (1) proof of securities law violations; (2) proof that the alleged aider-abettor knew of the violations and of its role in the scheme; and (3) proof that the alleged aider-abettor knowingly and substantially assisted in the violation. [case citations omitted]. In relation to the knowledge requirements of aiding-abetting, we note the Fifth Circuit's statement in *Woodward* [*v. Metro Bank of Dallas*, 522 F.2d 84], supra, at 95 [5th Cir.1975]: "The scienter requirement scales upward when activity is more remote; therefore the assistance rendered should be both substantial and knowing. A remote party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud;" The Fifth Circuit states further at 97:

"When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter."

Plaintiffs and F & M agree that establishing recklessness might be sufficient

to satisfy the scienter requirement for aiding and abetting liability if the bank had a fiduciary duty to the bondholders. [case citations omitted]. Without proof that F & M had a duty of disclosure, the standard of scienter Plaintiffs will be required to meet will be one of conscious intent. Without a duty to disclose, imposition of secondary liability using a standard of recklessness or a "should have known" test would effectively mean liability for negligence. This would contravene the rule of *Ernst & Ernst v. Hochfelder*....

In considering a 12(b)(6) Motion to Dismiss, the Court must accept as true the material facts alleged in the Complaint. *Reynolds v. United States*, 643 F.2d 707, 708 (10th Cir.1981).

As stated by the Court in *Bryan v. Stillwater Board of Realtors*, 578 F.2d 1319, 1321, (10th Cir.1977),

> A rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted puts in issue the legal sufficiency of plaintiff's declaration by admitting all of the well pleaded facts in the plaintiff's pleadings, thereby taking the position that even if all of those allegations are true, still no relief is warranted. Wright and Miller, Federal Practice and Procedure, Rule 12, §§ 1355, 1356, 1357, pp. 587–617. The test most often applied to determine the sufficiency of the complaint to state a claim is set forth in *Conley v. Gibson*, 355 U.S. 41 [78 S.Ct. 99, 2 L.Ed.2d 80] (1957):

>> ... In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

>> 355 U.S., at pp. 45, 46 [78 S.Ct. at 101, 102].

> *Accord: Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Dewell v. Lawson*, 489 F.2d 877 (10th Cir.1974); *Gas-A-Car, Inc. v. American Petrofina, Inc.*, 484 F.2d 1102 (10th Cir.1973); *Franklin v. Meredith*, 386 F.2d 958 (10th Cir.1967); Fed.Rule Civ.Proc., rule 8(a), 28 U.S.C.A.

Defendants contend that "[t]he major deficiencies of plaintiffs' Amended Complaint, which deficiencies command dismissal pursuant to Federal Rules of Civil Procedure 8 and 9 are ..." are that "[n]o facts are plead, with particularity or otherwise, which would place defendants on notice regarding facts giving rise to a duty to disclose"; that "no facts are plead which could give rise to an inference of any misrepresentation flowing directly from moving defendants to individual plaintiff limited partners"; that there are no allegations in the amended complaint as to "communications directly from Sweet, the Bank, Hurricane or HEC" and, therefore, defendants must "speculate on facts which would give rise to any nexus between any acts of moving defendants and plaintiffs' investment decision"; that "[t]he amended complaint is completely devoid of allegations regarding the amount, timing and details of the investment transactions by each plaintiff"; that there are no factual allegations "which would give rise to an inference of scienter"; and that the Amended Complaint is insufficient with respect to allegations necessary to show the transactions involved "securities within the purview of 10b–5 restrictions." (Defendants' Memorandum Brief filed April 5, 1984 at 11–12)

■ The factual allegations and the reasonable inferences to be drawn therefrom as set out in Paragraphs 15 through 46 of Plaintiffs' Amended Complaint clearly show the relationships between the various Defendants and the alleged participation of each Defendant in the alleged federal securities violations. Defendants' contentions that Plaintiffs' Amended Complaint fails to meet the pleading requirements of Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure, and that such pleading deficiencies require that the Complaint be dismissed pursuant to Rule 12(b)(6) are with-

out merit, and Defendants' Motion to Dismiss on those grounds should be denied.

■ Defendants' further contention that the Amended Complaint fails to allege facts sufficient to permit a permissive joinder of Plaintiffs in this action on the basis that "[t]he plaintiffs' allegations do not disclose the amount of the purchase by each of the investor/plaintiffs, when each such purchase was made, the nature of the information and materials upon which each relied, the source of that information or material, *or the damages suffered by each plaintiff,*" is also without merit. (Defendants' Memorandum Brief at 17) (emphasis in original) The "investor/plaintiffs" are identified in the Amended Complaint as those participants in the Westland and Newport Partnerships from whom funds were obtained "by selling interests in limited partnerships" (Paragraph 21 of the Amended Complaint) and from whom the Bank, as one of the conditions for its loans to Westland and Newport, "required each investor subscribing to the partnership to issue a letter of credit drawn on his or her individual bank in favor of Bank of Commerce in an amount equal to 75% of each investors subscription as security for the partnership loan ... [and] also required the limited partners to execute Assumptions of Personal Liability for the partnership loan." (Paragraph 23 of the Amended Complaint) It is also alleged that "the bank required that the limited partnership offering circular be submitted to it for approval." (*Ibid.*) As to the "damages suffered by each plaintiff," this figure can be supplied by Plaintiffs together with any other information relevant to the issues raised by the pleadings through discovery.

■ In addition to joining in the Motion to Dismiss filed on behalf of Defendants Bank and Sweet, the Defendants Hurricane and HEC also filed a Second Motion to Dismiss in which they contend that the Amended Complaint should be dismissed as to them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As noted above, the Amended Complaint clearly reveals the relationship between Sweet and the Defendants HEC and Hurricane. It is alleged that Sweet is "an owner, officer and/or director of both" Hurricane and HEC, which are "companies owned or controlled by Sweet." (Paragraph 12 of the Amended Complaint at 6) Hurricane and HEC are alleged to have sold drilling equipment and supplies to NOG as part of the alleged plan to divert funds from the Westland and Newport partnerships (Paragraphs 13, 14, 26(g), 26(i), 33, 34, 40(d), 40(e), 40(f), 40(h) and 44) Count III of the Amended Complaint alleges that "HEC and Hurricane through Sweet, knew of Rice's violation of Rule 10b–5 ... and HEC and Hurricane through Sweet, provided substantial assistance to Rice and were substantial factors in his violation of Rule 10b–5 ... and HEC and Hurricane are also liable as aiders and abettors." (Paragraphs 58 and 59 of the Amended Complaint at 24–25) Similar allegations are made with respect to HEC and Hurricane in Count VII. (Paragraphs 73 and 74 of the Amended Complaint at 27–28). Hurricane and HEC are also included in Count IX (Fraud), Count XI (Conversion) and Count XVIII (Conspiracy).

Defendants contention that "[t]he only allegations relating to HEC and Hurricane present in the Amended Complaint amount to no more than legal conclusions and are insufficient to constitute a cause of action," is without merit and the Second Motion to Dismiss of HEC and Hurricane pursuant to 12(b)(6) should be denied. *See Bryan v. Stillwater Board of Realtors, supra,* where the Court states "that a complaint should not be dismissed for failure to state a claim unless appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 578 F.2d 1319, 1321 (quoting *Conley v. Gibson,* 355 U.S. at pp. 45, 46, 78 S.Ct. at pp. 101, 102)

The Motion to Dismiss of Rice, Emerald Bay and Newport incorporates by reference the Memorandum Brief in Support of Motion to Dismiss Amended Complaint filed herein by Defendants Bank, Sweet, Hurricane, and HEC filed April 5, 1984.

(*See* Motion To Dismiss Amended Complaint Incorporating Memorandum Brief By Reference filed April 16, 1984) No other brief has been filed by the Defendants, Rice, Emerald Bay and Newport in support of their Motion to Dismiss. For the reasons stated herein with respect to the Defendants Bank, Hurricane, HEC and Sweet, the Motion to Dismiss of Rice, Emerald Bay and Newport should be denied.

## MOTIONS OF DEFENDANTS TO DISMISS COUNT II OF THE AMENDED COMPLAINT

In support of their motions to dismiss Count II of the Amended Complaint Defendants contend that "there is no statutory provision for civil enforcement of Section 17(a)"; [1] that "[t]he Supreme Court has repeatedly reserved decision on whether § 17(a) affords a private remedy"; that "[t]he Tenth Circuit likewise has yet to express an opinion on this point while the balance of the Federal Courts have long diverged on the question on whether an implied private right of action exists under § 17(a)"; that "Federal district courts within this circuit have followed the reasoning urged by the defendants herein holding that private plaintiffs have no jurisdictional standing to invoke the provisions of § 17(a)"; that "[t]his Court, in *Spelman v. F & M Bank and Trust Company, et al.*, No. 80-C-106-B, reached the same result, albeit with the ultimate confession by the plaintiffs that their reliance upon § 17(a) was misplaced"; that "the ultimate issue is whether congress *intended* to create a private cause of action"; (emphasis in original) that the Fifth Circuit recently held in *Landry v. All American Assurance Co.*, 688 F.2d 381, 389–91 (5th Cir.1982) "that a private cause of action *could not* be implied under § 17(a)." (emphasis in original)

and that "in those courts that have found that § 17(a) supports a private claim, where both § 17(a) and Rule 10b–5 are asserted, little weight is given to the implied § 17(a) action." (Defendants' Memorandum Brief filed February 7, 1984 at 3–9) Defendants urge that "there is little practical significance in proceeding with claims asserted under § 17(a) because the 10b–5 claim substantially overlaps with the § 17(a) claim and because 10b–5 claims are generally regarded as broader than § 17(a) claims." (*Id.* at 9)

In response Plaintiffs note "that in the face of the Supreme Court's silence, the Circuit Courts of Appeals are split over whether Section 17(a) of the Securities Act of 1933 affords a private remedy." They further note that "[t]he majority says it does ... the Ninth, Second, Seventh and Fourth—are in favor of permitting plaintiffs to base civil claims upon Section 17(a) ... [while] "[t]he Fifth and Eight Circuits have rejected a private remedy." (Memorandum Brief of Plaintiffs filed March 5, 1984 at Pages 1–2)

Plaintiffs further contend that "[a]lthough the Tenth Circuit has not yet dealt squarely with the issue, its only expression on the subject appears receptive to the majority view." Plaintiffs cite the following language from *de Haas v. Empire Petroleum Co.*, 435 F.2d 1223, 1229–30 n. 4. (10th Cir.1970):

We shall also consider the issue ["as to whether punitive damages are allowable in civil action implied under the general anti-fraud provisions of Rule 10b–5"] in relation to section 17(a) of the Securities Act of 1933 since the courts have generally "endeavored to treat the '33 and '34 Acts *in pari materia* and to construe

---

1. § 17(a), 15 U.S.C. § 77q(a) provides:
    It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
    (1) to employ any device, scheme, or artifice to defraud, or
    (2) to obtain money or property by means of any untrue statement of a material fact or

any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or
    (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

them as a single comprehensive scheme of regulation." *Globus v. Law Research Serv., Inc.,* 2 Cir., 418 F.2d 1276, 1286. And we approach the problem in the firm belief that it would be most undesirable to establish a rule that would have less than broad application. An ad hoc consideration of the varying types of cases springing from Rule 10b–5 would lead to great and predictable confusion in the law.

(Plaintiffs' Memorandum Brief at 2–3)

Plaintiffs also point out that "courts that have ruled in favor of a private right of action have generally done so because, given the similarity between § 17(a) and § 10(b), they see 'little practical point in denying the existence of a right under § 17 once it is established that an agreed buyer has a private action under § 10(b) of the 1934 act.' *Stephenson v. Calpine Conifers II, Ltd.* [652 F.2d 808, 815 (9th Cir. 1981) ] (quoting *Kirshner v. United States,* 603 F.2d at 241)." (Plaintiffs' Memorandum Brief at 3)

Plaintiffs further note that courts refusing to permit a private action under § 17(a) hold that to do so would permit Plaintiffs to circumvent the express limitations placed on civil remedies by §§ 11 and 12 of the 1933 Act and "frustrate the carefully laid framework of the act." *Landry v. All American Assurance Co., supra,* at 391. (Plaintiffs' Memorandum Brief at 4)

Finally, Plaintiffs refer to a recent decision of the United States Supreme Court, *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). *Huddleston* is the subject of a recent article, Schwartz and Wiles, *Do Curran & Huddleston Validate A Private 17(a) Right of Action?,* The National Law Journal, 20–21, 29 (July 23, 1984). After noting that the Supreme Court "emphatically upheld the existence of an implied private right of action under Sec. 10(b) of the Securities Exchange Act of 1934," the authors further state:

The court unanimously rejected arguments that no private right of action should be implied under Sec. 10(b) when the injured party already has an express right of action under Sec. 11 of the Securities Act of 1933 ...

The opinion's unanimity suggests that the court believes it has now laid to rest one of the most vexing issues in the securities law area: Whether a private right of action may be implied in circumstances where another portion of the securities laws grants an express right of action.

However, an analysis of *Huddleston* and the court's earlier decision in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Curran,* [456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) ], strongly suggests that the ... application of the so-called "legislative re-enactment" doctrine first enunciated in *Curran* an expressly made applicable to private rights of action under the securities laws in *Huddleston* supports implication of a private right of action under Sec. 17(a) of the Securities Act ...

The authors further observe that "[n]one of the courts that recently have denied a private 17(a) remedy has addressed the test announced in *Curran* and *Huddleston* ..." but it is their view that "judicial applications of *Curran* and *Huddleston* in other contexts illustrate the clear likelihood that the Curran/Huddleston methodology will be employed correctly to buttress decisions finding an implied private 17(a) right of action." (citations omitted) *Id.* at 20.

Plaintiffs urge that "[t]he same logic and policy reasons that lead the Supreme Court to conclude that an express remedy under § 11 does not preempt an implied remedy under § 10(b) should persuade this Court that the majority is right in holding that the express remedies of the same § 11 and § 12 do not preempt the availability of an implied right of action under § 17(a), at least where the Plaintiffs have already alleged a cause of action based upon § 10(b) and Rule 10b–5." (Plaintiffs' Memorandum Brief at 5) *See Seiffer v. Topsy's International, Inc.,* 487 F.Supp. 653, 662 (D.C.Kan.1980). In *Seiffer* the court states

... that because § 17(a) is virtually identical to Rule 10b–5, there is little practical point in denying the right to maintain a private action. The conduct prohibited by Section 17(a) does not seem to vary in any significant respect from that prohibited by Rule 10b–5.... Rule 10b–5 relates only to sales and Section 17(a) to offers or sales ...

*See also Geller v. Prudential-Bache Securities, Inc.,* 591 F.Supp. 27 (W.D.Ok.1983). In denying Defendants' Motion to Dismiss Plaintiffs' Cause of Action based on Section 17(a) the Court stated:

In light of the Supreme Court's statements in *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), that "[a] cumulative construction of the securities laws also furthers their broad remedial purposes," and "securities laws combating fraud should be construed 'not technically and restrictively, but flexibly to effectuate [their] remedial purposes.' *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 195 [84 S.Ct. 275, 284, 11 L.Ed.2d 237] (1963)" this Court is persuaded that the holding of *Freeman v. McCormack* [490 F.Supp. 767 (W.D.Ok 1980)] will ultimately be rejected by the Tenth Circuit. Thus, this Court will depart from its previously holding in *Freeman, supra.*

A motion to dismiss must be denied unless the plaintiffs can prove no set of facts in support of their claim for relief. *Scheuer v. Rhodes,* 416 U.S. 232 [94 S.Ct. 1683, 40 L.Ed.2d 90] (1974). Under this standard, defendants' motion to dismiss must be denied.

In its Order filed February 25, 1981 in *Spelman,* it was not necessary that the Court address the § 17(a) issue except for the purpose of finding that "[t]he Motion for Partial Summary Judgment of Bache Halsey Stuart Shields, Inc. is sustained, Plaintiffs having conceded there is no private right of action under 17(a) of the Securities Act of 1933." *Huddleston* and *Curran* had not yet been decided by the Supreme Court.

■ This Court finds the majority view of the circuit courts which have considered the § 17(a) private right of action issue to be persuasive, particularly in light of the Supreme Court's decision in *Huddleston.* Therefore, Defendants' Motions to Dismiss Count II of the Amended Complaint on the ground that § 17(a) does not permit a private right of action is denied.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE FOURTH AND FIFTH COUNTERCLAIMS OF THE DEFENDANT BANK OF COMMERCE AND TRUST COMPANY

The Bank contends that Plaintiffs' Motion for Partial Summary Judgment on the Bank's Fourth and Fifth Counterclaims need not be considered by the Court since those counterclaims were filed in response to Plaintiffs' original Complaint; that after Plaintiffs filed their Amended Complaint, the Bank did not file an amended answer and counterclaims but instead filed a Motion to Dismiss, which pleading superseded its original answer and counterclaims and, therefore, its counterclaims are no longer pending. (Bank's Brief filed May 29, 1984). The Bank further states that in the event the court determines that the Counterclaims have survived the filing of the Amended Complaint and the Bank's Motion to Dismiss, the Bank would ask that this court render Summary Judgment in its favor based upon the provision in both promissory notes for collection costs and attorney's fees in the amount of 15% of sums due and payable upon default. (*Id.* at 4–5).

Because the Bank's Fourth and Fifth Counterclaims have not been dismissed, and are therefore still pending, the Court will address the issues raised by Plaintiffs' Motion for Partial Summary Judgment and the Bank's Counter Motion for Partial Summary Judgment on its Fourth and Fifth Counterclaims.

In the Answer, Counterclaim, Cross-Claims, and Third Party Complaints of Defendant Bank of Commerce filed February 7, 1984 in response to Plaintiffs' original Complaint the Bank asserts as its Fourth

compulsory counterclaim against Westland, Pinegar, Craig Pickering, and the Plaintiffs who are investors in the Westland partnership that the Plaintiffs Westland, Pinegar and Pickering executed a note to the Bank dated December 29, 1981 in the sum of $787,500; that said Plaintiffs agreed to pay the Bank "reasonable costs of collection, including an attorneys' fee of 15% of all sums due upon default"; that Pinegar, acting on behalf of Westland," renewed that Note and corresponding obligations related thereto on the 15th day of December, 1982"; that the Note included an identical provision obligating the obligors to pay reasonable costs of collection, including an attorneys' fee of 15% of all sums due upon default"; that the investors of Westland executed an Agreement to assume personal liability on said notes; that Plaintiffs Westland, Pinegar and Pickering failed to pay the note, and that as a result thereof, the Bank has incurred "substantial costs and attorneys' fees."

Similar allegations are asserted in the Bank's Fifth Compulsory Counterclaim against Newport, Pinegar and the Plaintiffs who are investors in the Newport partnership in connection with a note to the Bank dated June 8, 1982 in the sum of $1,087,500. The Bank claims that it is entitled to "costs and attorney's fees in the amount of 15% of the principal obligation of the note."

In support of their Motion for Partial Summary Judgment, Plaintiffs contend that the Bank's "actual costs were, at the most, $4,493.10, including $2,677.50 in attorneys' fees"; that "[a]lthough the Bank has collected the full balance owing on the loans, it refuses to release mortgages it holds on certain properties owned by Westland and Newport"; that Plaintiffs are entitled to "a determination that, under the appropriate measure of damages, their maximum liability under the bank's Fourth and Fifth counterclaims cannot exceed the actual amount the bank claims to have expended in costs and attorneys' fees"; and that Plaintiffs are entitled to "an injunction requiring the bank to release the mortgages it holds on Westland and New-

port properties." (Plaintiffs' Memorandum Brief filed May 9, 1984 at 2)

Attached to Plaintiffs' Memorandum Brief is an Affidavit of Pinegar dated April 16, 1984 in which Pinegar states, *inter alia,* that "[i]n June 1983, the Bank refused to renew the Newport loan"; that "[t]he Bank also called the Westland loan in default"; that "[t]he Bank then informed [him] of their immediate intention to collect on the notes through the letters of credit given as security"; and that "[t]he Bank proceeded to collect the full balance owing on both loans by calling letters of credit on the individual limited partners." (Pinegar's Affidavit at 3) Pinegar further states that "[o]n or about July 13, 1983, [he] received a statement from the Bank demanding $4,493.10 for costs, including airfare and miscellaneous expenses, and attorneys' fees arising from collection on the letters of credit." There is attached as Exhibit "G" to Pinegar's Affidavit a copy of the statement. Pinegar further states that he "refused to pay the amount stated as [he] believed it was excessive"; that on or about September 12, 1983 he received a letter from Sweet "demanding payment of the aforementioned statement before the Bank would release the mortgages on the property of Westland and Newport." (*Ibid*) Attached to Pinegar's Affidavit as Exhibit "H" is a copy of Sweet's letter.

Plaintiffs contend that because there are no material issues of fact with respect to the actual costs and attorneys' fees incurred by the Bank in connection with the collection of the Westland and Newport notes they are entitled to summary judgment on the Bank's Fourth and Fifth Counterclaims.

In response, the Bank contends that it "incurred attorney's fees, internal administrative costs, travel costs, and lost opportunity costs, the reasonableness and sufficiency of which are rendered moot by the contractual provision contained within the notes for fifteen percent (15%) of the amount due upon default"; that Plaintiffs' Exhibits "G" (Bank's Statement) and "H"

(Sweet's letter) were offers of settlement by a bank officer and did not represent the Bank's actual costs and attorneys' fees expended in connection with the collection of the Westland and Newport notes; that "[t]he Bank has never asserted that it is not legally entitled to costs in excess of the $4,493.10 amount as alleged in Plaintiffs' brief"; that "[t]he Bank and agents thereof have never represented to anyone that their only costs were legal fees in the amount of $2,677.50, airfare of $1,184.00, and miscellaneous expenses in the amount of $631.00"; that "[i]n fact, there are substantial internal costs associated with making loans and collecting unpaid loans to which the Bank feels it is entitled pursuant to the provisions of notes executed on behalf of the partnerships." (*Id.* at 7–10.) The Bank further states that "bank officers are currently out of the state, but affidavits will be supplied to the court prior to the June 7, 1984 hearing." (*Id.* at 10.)

On June 6, 1984, prior to the hearing on the Motions for Summary Judgment, the Bank filed an affidavit of Freddy L. Hurst, Vice President and Controller of the Bank and an unsigned affidavit of Larry D. Sweet, Senior Vice President of the Bank, in support of its Motion for Summary Judgment and in opposition to Plaintiff's Motion for Summary Judgment. Following the hearing the Bank filed a signed Affidavit of Sweet on June 15, 1984 which Affidavit was not identical to the earlier unsigned affidavit of Sweet.

On June 22, 1984 Plaintiffs filed a Motion to Strike Affidavits of Larry D. Sweet because of the variance in the language included in the two affidavits. For example, in the unsigned affidavit Paragraph 4 states: "That the offer of settlement dated September 12, 1983 [Sweet's letter] was never accepted by Mr. James Pinegar on behalf of the Westland Energy 1981–1 partnership. That the offer of settlement was never accepted by Mr. James C. Pinegar on behalf of the Newport Energy 1981–1 Limited Partnership." In the signed affidavit the September 12, 1983 letter of Sweet is not described as "the offer of settlement." Instead, Sweet states in his signed affidavit: "[t]hat he did send a letter to Mr. James C. Pinegar on September 12, 1983"; that "[t]he letter represented certain of the expenses which had been incurred by the Bank to that date in respect to obligations of the Westland and Newport partnerships"; and "[t]hat at no time has he ever represented that the Bank is not legally entitled to the collection costs provided for in the notes ... [or] that the Bank's costs of collection consist only of legal fees." Sweet further states: "That substantial legal fees have been incurred by the Bank of Commerce and Trust Company in regard to the Newport and Westland Partnership debts, and that the amount of such attorney's fees will not be determined until the conclusion of this lawsuit."

In its Memorandum Brief filed on July 2, 1984 the Bank states that the difference in the language of the Sweet affidavits was brought about by the Bank's effort to avoid seeking a postponement of the Court's hearing on the Plaintiffs' Motion for Partial Summary Judgment; that Sweet was out of town and unavailable to sign an Affidavit prior to the hearing; that counsel for the Bank made telephone contact with Sweet for the purpose of obtaining testimony in opposition to Plaintiffs' Motion for Partial Summary Judgment; that "[a]pparently in the course of those communications, errors were made by counsel for the Bank regarding the language that Mr. Sweet wanted to use in his representations of fact before the court"; that upon Sweet's return to Tulsa, and after examining the proposed affidavit which counsel for the Bank had filed without Sweet's signature on June 6, 1984, "it was Mr. Sweet's position that he could not execute the affidavit as worded"; that "revisions were made in the Affidavit, and said revised Affidavit was executed by Mr. Sweet and filed with the Court on or about June 15, 1984." (Bank's Memorandum Brief filed July 2, 1984 at 2–3)

Plaintiffs contend that "[p]rior to the June 7, 1984 hearing, counsel for the Bank asked [counsel for Plaintiffs] for permis-

sion to file an unsigned affidavit in support of the bank's opposition to the plaintiffs' motions and represented that upon Mr. Sweet's return to Tulsa the affidavit would be signed in the precise form in which it was filed"; that it was only upon that agreement that the [counsel for plaintiff] agreed to stipulate that the unsigned affidavit be deemed filed," and that because the agreement was violated by the Bank's counsel, the affidavits should be stricken. (Plaintiffs' Memorandum Brief filed June 22, 1984)

■ It is the view of the Court that the unsigned affidavit filed June 6, 1984 of Larry D. Sweet should be stricken. However, the affidavit of Mr. Sweet filed on June 15, 1984 should not be stricken. The Court will consider Sweet's Affidavit in connection with Plaintiffs' Motion for Summary Judgment and will weigh the testimony of Sweet in light of the circumstances surrounding the execution of the Affidavit together with all of the other evidence in support of and in opposition to Plaintiff Motion for Partial Summary Judgment.

If there are disputed factual issues summary judgment must be denied. *Bankers Trust Company v. Transamerica Title Insurance Company*, 594 F.2d 231 (10th Cir. 1979). In *Bankers Trust Company*, the court stated:

> Summary Judgment must be denied unless the moving party demonstrates his entitlement to it beyond a reasonable doubt. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027 (10th Cir.1978); *Mustange Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33 (10th Cir.1975). The Courts must consider factual inferences as tending to show triable issues of material facts in the light most favorable to the existence of such issues in assessing a motion for summary judgment. *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168 (10th Cir.1974). Pleadings and documentary evidence must be construed liberally in favor of the party opposing such a motion. *Harman v. Diversified Medical Investments Corporation*, 488 F.2d 111

(10th Cir.1973), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). 594 F.2d at 235.

In *Pierce v. Ford Motor Company*, 190 F.2d 910, 915 (4th Cir.1951), the Court stated:

> "Even in cases where the judge is of the opinion that he will have to direct verdict for one party or the other on the issues that have been raised, he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgment, which was never intended to enable parties to evade jury trial or have the judge weigh evidence in advance of its being presented.

■ Because there are disputed factual issues with respect to the Fourth and Fifth counterclaims of the Bank, Plaintiffs have not demonstrated their "entitlement to [summary judgment] beyond a reasonable doubt." 594 F.2d at 235. Therefore, Plaintiffs' Motion for Partial Summary Judgment on the Bank's Fourth and Fifth Counterclaims is denied.

As to Plaintiffs' Motion for Preliminary Injunction, Plaintiffs have not demonstrated that they "will suffer irreparable injury unless the injunction issues." *Lundgrin v. Claytor, supra*, 619 F.2d at 63. Moreover, the Bank is entitled to its lien on the Westland and Newport properties until such time as all issues with respect to those loans and liens in connection therewith have been finally resolved. Therefore Plaintiffs' Motion for Preliminary Injunction is denied.

### APPLICATION OF DEFENDANTS BANK, SWEET, HURRICANE AND HEC FOR SECURITY FOR COSTS

■ Defendants' Application for Security for Costs seeks "an order requiring Plaintiffs to give security for costs in the sum of $120,000 pursuant to Rule 25(b) of the Rules of the United States District Court for the Northern District of Oklahoma and 15 U.S.C. § 77k(e)." In support of its application Defendants contend that the approximately 80 plaintiffs are non-res-

idents of Oklahoma; that the " 'lead plaintiffs' in this case are either *indebted* to the Bank ... and/or have executed agreements indemnifying the Bank and its representatives from the very claims which have been made by the Plaintiffs in this case"; that "the Bank has counterclaimed against the plaintiff James C. Pinegar for payment of a promissory note in the principal amount of $150,000, which is currently over Thirteen (13) months past due at the Bank"; that Pinegar resides in Utah and is President of Westland and Newport; that it was Pinegar who promoted and sold the limited partnership interests which are the subject of this lawsuit; that Pinegar personally indemnified the Bank from the consequences of violations and alleged violations of federal and state securities laws arising out of the offering and sale of limited partnership interests in the Westland partnership; that Pinegar and Newport are indemnitors to the Bank and its officers by virtue of an Indemnity Agreement under which Indemnity Agreement liability is sought to be enforced against Pinegar and Newport by the Bank in its Third Compulsory counterclaim; that Westland, Pickering, Pinegar, the investors in Westland, Newport and the Newport investors are personally liable to the Bank on promissory notes as asserted in the Bank's Fourth and Fifth counterclaims; and that "plaintiffs' lack of resources, coupled with the obvious 'reactionary' nature of their complaint, furnish a strong basis for requiring that they provide adequate security for the continued prosecution of this action." (Defendants' Memorandum Brief filed March 21, 1984 at 4–6). Defendants further contend that Plaintiffs' claims against them are without merit; that Plaintiffs' discovery requests are extensive and will cause Defendants to incur considerable expense in connection therewith; and that extensive discovery will be conducted by Defendants, including, *inter alia*, the taking of depositions of each of the 80 plaintiffs which will add considerable expense. Defendants further state that the cost security bond which they seek in the sum of $120,000 would constitute an undertaking of approximately $1500 per plaintiff. (*Id.* at 12)

Although under Rule 25(b) of the Rules of this Court, "the Court may at any time order any party to give security, bond or undertaking in such amount as the Court may order for the payment of costs," the record in the instant case does not indicate that the Court should make such a requirement of the Plaintiffs at this time. Defendants have offered no evidence that the 80 plaintiffs would not be able to pay any costs that Defendants may recover against them in this action. Indeed, as Defendants suggest in their memorandum brief, the amount of the bond requested amounts to approximately $1500 per plaintiff. Substantial sums of money have already been collected from Plaintiffs on letters of credit in connection with the Westland and Newport transactions. For the Bank to have made loans in the Westland and Newport transactions of nearly $2,000,000, would indicate that the Bank was at the time of the loan transactions satisfied that Plaintiffs were financially able to meet such obligations. Additionally the Bank has a lien on the Westland and Newport properties as security for payment of any costs and attorneys' fees which they may recover in connection with the Westland and Newport loans. Therefore, Defendants' Application for Security for Costs is denied.

In Plaintiffs' letter to the Court dated December 4, 1984 Plaintiffs stated that they "have filed a Withdrawal of [their] Motion for Preliminary Injunction because of changes in circumstances between June 1984 and the present, which have rendered the questions raised by [their] Motion for Preliminary Injunction moot." It is therefore ordered that Plaintiffs' Motion for Preliminary Injunction is moot.

It is further ordered that the Motions of Defendants Bank, Sweet, Hurricane, HEC, Emerald, NOG, and Rice to Dismiss Amended Complaint, Second Motion to Dismiss of Defendants HEC and Hurricane, Motion of Plaintiffs for Partial Summary Judgment on the Bank's Fourth and Fifth Counterclaims, Motion of Bank for Partial

Summary Judgment on its Fourth and Fifth Counterclaims, Motion of Plaintiffs to Strike Affidavits of Sweet, and Application of Defendants Bank, Sweet, Hurricane and HEC for Security for Costs are denied.

It is further ordered that this case is set for a status conference and hearing on all pending discovery matters before the United States Magistrate on the 4th day of January, 1985 at 10 o'clock A.M.